## GENERAL ELECTRIC COMPANY

v.

### The UNITED STATES.

No. 81–70.

United States Court of Claims.

Feb. 22, 1978.

746

Douglas B. Henderson, Washington, D. C., attorney of record, for plaintiff.

Finnegan, Henderson, Farabow & Garrett, Richard H. Smith, C. Larry O'Rourke, Washington, D. C., Irving M. Freedman, Utica, N. Y., Harry F. Manbeck, Jr., Fort Wayne, Ind., of counsel.

Steven Kreiss, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and DAVIS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## OPINION

### PER CURIAM:

This patent suit concerning servomechanisms presents several separate issues. Trial Judge Colaianni has filed a thorough and careful report giving his rulings and finding the relevant facts. Plaintiff has sought review of significant parts (but not of all) of the adverse aspects of the trial judge's decision, and the defendant asks review of all the decision adverse to it. We have heard oral argument *en banc* and considered the briefs and record. Our conclusion is that the trial judge is correct on all points except his ruling that defendant's overhaul of the 5″/38 single Mk 30 gun mounts at NOS Louisville during the 1967 to 1971 period amounted to impermissible reconstruction for which plaintiff should be compensated. We hold, on the contrary, that such overhaul amounted to permissible non-compensatory repair. On that issue we do not adopt the trial judge's opinion but set forth our own differing views in Part II, *infra*, of this *per curiam* opinion. In Part I, *infra*, we adopt as our own, and set forth, the trial judge's opinion on the other aspects of the case (with minor supplementation and modification by the court).* Our ultimate conclusion is that plaintiff is not entitled to recover and the petition is dismissed.

---

* While the court adopts (with some modifications and additions) the trial judge's separate findings of fact, as set forth in his report filed September 16, 1976, they are not printed herein since they are voluminous and the facts necessary to understand the decision are contained in this *per curiam* opinion.

## PART I.

Trial Judge Colaianni's opinion (except for the part dealing with overhaul at NOS Louisville, and also including minor supplementation and modification by the court) is as follows:

### COLAIANNI, Trial Judge.

In this patent suit under 28 U.S.C. § 1498, plaintiff contends that various claims of three of its patents have been used or made by or for defendant without license or lawful right. Plaintiff, accordingly, seeks reasonable and entire compensation for such unauthorized acts. Defendant pleaded a whole host of defenses. Indeed, the validity of each of the patents is attacked on a variety of grounds. In addition, defendant alleges that it does not infringe any of the patents at bar.

Plaintiff is the owner by assignment of the entire right, title and interest in the patents here in suit. The parties have agreed to the deferral of the issue of accounting until after final resolution of the question of liability.

For reasons hereinafter stated, it is concluded that the claims at issue in the United States Letters Patents 2,550,514 and 2,414,685 are invalid. It is further concluded that claims 7 and 17 of United States Letters Patent No. 2,679,138 are invalid. It is also concluded that claim 8 of patent No. 2,679,138 is valid.

### Patent No. 2,550,514

United States Letters Patent No. 2,550,514 (hereinafter referred to as the '514 patent) was issued to Dr. Ernst F. W. Alexanderson on April 24, 1951, for an invention entitled "System for Reproducing Position" and was based on an application filed on May 19, 1932.

The invention relates to position follow-up control systems or servomechanisms.

Generally, such systems are characterized by a pilot device and a driven object. An objective is to have the driven object follow the positional movement of the pilot device accurately and in a stable manner. An example of such a system is a shipborne gun and turret which is driven to follow the position of a telescope.

Conventionally, well-known induction devices, commonly referred to as selsyns, are connected between the telescope and gun such that a voltage signal is generated which is representative of the positional departure of the gun from the telescope. Amplifiers are used to amplify the voltage or error signal for actuation of a direct current (hereinafter sometimes referred to as "d. c.") motor which in turn controls the movement of the gun towards correspondence with the telescope. As the gun approaches positional agreement with the telescope, the error signal is proportionally reduced, eventually reaching zero when correspondence is achieved. Basic position control systems such as that described above were known prior to the invention of the '514 patent.

Positional servomechanisms of the above kind encounter problems of oscillation, commonly known as hunting, due to the inertia of the objects involved and the inherent time lags due to the servo components. Hunting can basically be described as oscillation of the gun back and forth about the point of correspondence. Due to the inductance of the servo components, the error signal is constantly lagging the actual departure of the gun from correspondence. As a result, the corrective action also lags the actual departure at any given moment, thus causing the gun to continually overshoot the desired position. Such a phenomena is clearly undesirable in many systems where speed and accuracy of position are critical.

Traditionally, one approach to servo control involved increasing the system gain in an effort to eliminate hunting. The gain of a system is defined as the ratio of output power, current or voltage, to input power, current or voltage, respectively. Such an approach is unsatisfactory, however, since instability is encountered once a certain gain level is reached. Thus, there is a trade-off in any servo system between gain and stability. The prior art of record in this action discloses various techniques of position control aimed at eliminating or preventing the problem of hunting.

*Plaintiff's Patented System*

The invention of the '514 patent is drawn to a position control system of the above variety wherein hunting is eliminated or prevented.

At col. 2, lines 28 to 38, of the '514 patent, Dr. Alexanderson broadly describes one approach to anti-hunting:

In carrying the invention into effect in one form thereof, changes in the torque or synchronizing force are utilized for modifying the synchronizing force in such a manner as to anticipate the final position and to bring the interconnected devices into correspondence without hunting or oscillation. In a system in which an electric motor is employed to drive an object into positional agreement with a control object, changes in the torque of the motor are so utilized.

Figure 1 of the '514 patent, reproduced in the findings, synthesizes this concept.

In the patented system a pair of selsyns are connected between a gun and telescope for generating a voltage representative of the error or positional disagreement. This error signal is applied to a thyratron control amplifier and, following amplification, is supplied to a direct current motor for driving the gun into correspondence with the telescope.

In order to avoid hunting by the gun, circuitry is provided for generating a modifying signal that combines with the error signal applied to the thyratron amplifier for driving the direct current motor. As disclosed, the circuit includes an anti-hunting means, described as being composed of a magnetic saturable core reactor having a plurality of direct current-supplied control windings and a plurality of alternating cur-

rent-supplied reactive windings which are inductively related to each other. The control windings are connected in series to form a bridge and the reactive windings are connected in parallel to form a bridge.

One diagonal of the reactive winding bridge is connected to a source of alternating current while the other diagonal is connected to the control windings of an output transformer, which applies the bridge output to the control circuit of the thyratron amplifier. One diagonal of the control winding bridge is connected to a source of direct current while the other diagonal is connected to the secondary winding of an input transformer. The manner of operation of the input transformer will be described in greater detail, *infra*, but generally can be described as permitting only changes of torque of the d.c. motor to initiate operation of the anti-hunting means.

The primary winding of the input transformer is shunted by an unmarked resistor and connected across the armature of the direct current drive motor. No voltage is induced in the secondary winding of the input transformer when the drive motor current is steady. However, when the drive motor current is changing, a voltage is induced in the transformer secondary and applied to the anti-hunting means. In the absence of an input, the anti-hunting means is magnetically balanced. Any input unbalances the bridge, causing a proportionate output to be applied by way of the output transformer to the thyratron control amplifier. In turn, the operation of the amplifier will affect the direct current motor.

The patent clearly teaches that no modifying signal is to be produced during constant current operation of the direct current drive motor. The self-imposed limitation of the anti-hunting operation by the patentee to only such times when the torque of the direct current drive motor is changing is emphasized at col. 8, line 61, to col. 9, line 3, of the '514 specification:

Thus it will be seen that a change in the direction of rotation of the motor * * * [12] produces a change or a reversal of the phase of the voltage supplied from the anti-hunting device to the control circuit of the electric valve apparatus. Furthermore, it will be observed that since the direct current control winding bridge is connected to the motor circuit through a transformer that the anti-hunting means 55 is responsive only to changes in the motor current and since the voltage which it supplies to the control circuit for the electric valve apparatus is roughly proportional to the motor current, the anti-hunting means 55 is in this sense responsive to the rate of change of motor current and since the motor current is a measure of its torque, the anti-hunting means is thus responsive to rate of change of torque.

A further characteristic of the anti-hunting means is that it causes the modifying signal to lag changes in the drive motor current, as described in the specification at col. 12, lines 23 to 30:

Due to the fact that the alternating current reactive coils of each arm of the bridge are short circuited upon each other, the anti-hunting means functions as a transformer with a short-circuited secondary, the large inductance of which causes the direct current magnetization to be considerably lagging with respect to the changes in motor current.

However, the modifying signal applied by way of the output transformer to the thyratron amplifier causes the drive motor current to lead the actual departure from correspondence and operates to bring the gun into correspondence without overshoot.

### Scope of Claims Involved in Suit

Plaintiff argues that the inventions defined by claims 35 and 36 of the '514 patent have been used and/or manufactured by defendant without plaintiff's authorization. Claim 35, broken down into lettered sections element by element for ease of reference, reads as follows:

35. A follow-up control system comprising in combination

(a) a pilot device,

(b) a driven object,

(c) driving means for said object,

(d) control means for said driving means.

(e) means responsive to positional disagreement of said pilot device and driven object for actuating said control means to control said driving means to drive said object toward correspondence with said pilot device, and

(f) anti-hunting means responsive to the rate of change of torque of said driving means for actuating said control means.

Claim 36, similarly broken down into lettered sections element by element, reads as follows:

36. A follow-up control system comprising in combination

(a) a pilot device,

(b) a driven object,

(c) driving means for said object,

(d) means for controlling the energization of said driving means,

(e) means responsive to positional disagreement of said pilot device and driven object for actuating said control means to control said driving means to produce a torque for driving said object toward correspondence with said pilot device, and

(f) anti-hunting means for actuating said control means in accordance with the rate of change of said torque.

Both claims 35 and 36 are combination claims drawn to position follow-up control systems.

Defendant asserts that both claims 35 and 36 are invalid under 35 U.S.C. § 102 (1970 & Supp. V 1975) and 35 U.S.C. § 112 (1970 & Supp. V 1975). Further, noninfringement is also asserted as a defense. In view of the conclusions reached with respect to Section 112, the court need not and does not reach the validity question under Section 102 or the infringement issue.

As a prelude to a thorough consideration of Section 112,[1] it is necessary to point out that the parties are in complete disagree-

ment concerning the interpretation to be given element (f) of both claims 35 and 36. Defendant asserts that element (f) of claims 35 and 36 refers only to the anti-hunt means 55 shown in Fig. 1 of the '514 patent. On the other hand, plaintiff contends that anti-hunt means 55, input transformer 81 and its unmarked shunt resistance, as well as output transformer 75, are all included within the phrase anti-hunting means of both claims 35 and 36. As the following analysis will reveal, defendant's interpretation is the correct one.

In *Autogiro Co. of America v. United States,* 384 F.2d 391, 397–98, 181 Ct.Cl. 55, 63 (1967), this court, in referring to the relationship between the claims of a patent and its specification, stated:

In serving its statutory purpose, the specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification. U.S.Pat.Off. Rule 75(d). The use of the specification as a concordance for the claims is accepted by almost every court, and is a basic concept of patent law. [footnotes omitted]

■ This precept takes on particular significance where the definition of a term appearing in a claim is disputed by the parties. Since the patentee is his own lexicographer, no genuine issue of fact as to the meaning of a claimed term can be found to exist where the meaning is made incontrovertibly clear elsewhere in the patent or in the file wrapper. *Duplan Corp. v. Deering Milliken, Inc.,* 370 F.Supp. 769, 772, 180 USPQ 373, 376 (D.S.C.1973), and cases cited therein.

A careful review of the '514 patent and its file wrapper provides invaluable insight as to the proper interpretation and meaning to be given to element (f) of claims 35 and 36.

Turning first to the specification, col. 6, line 72, to col. 7, line 3, plaintiff emphasized

1. 35 U.S.C. § 112 provides in pertinent part: "The specification shall conclude with one or more claims particularly pointing out and dis-

tinctly claiming the subject matter which the applicant regards as his invention."

that anti-hunting means 55 was to be responsive to transient conditions in the system:

> In order to prevent the gun 10 from hunting or oscillating about the position of correspondence with the telescope 11, *anti-hunting means* 55 are provided for modifying or controlling the voltage applied to the control circuit of the electric valve apparatus 14 in accordance with transient conditions in the system. (emphasis added)

The structure referred to by the numeral 55 is subsequently referred to in the patent specification as the anti-hunting means 55, the anti-hunting device 55, or the anti-hunting detector 55, on numerous occasions. Significantly, there is not a single instance to which plaintiff can point where the specification refers to either transformer 81 or transformer 75 as the anti-hunting means. Equally significant is the lack of specification support for plaintiff's position that the phrase anti-hunting means was intended to cover transformers 75 and 81 as well as the bridge connected control and reactive windings.

■ A comparison of certain other claims of the '514 patent with claims 35 and 36 further supports the conclusion that the term anti-hunting means as used in the claims at bar refers only to anti-hunting means 55. Significant evidence of the scope of any claim is the language employed in other claims of the same patent. *Bethell v. Koch,* 427 F.2d 1372, 1374, 57 CCPA 1233, 166 USPQ 199, 201 (1970). See

also *Stukenborg v. Teledyne, Inc.,* 299 F.Supp. 1152, 161 USPQ 10 (C.D.Cal.1969), *aff'd,* 441 F.2d 1069, *cert. denied,* 404 U.S. 852, 92 S.Ct. 90, 30 L.Ed.2d 92 (1971); and *Leach v. Rockwood & Co.,* 273 F.Supp. 779, 154 USPQ 356 (W.D.Wis.1967), *aff'd,* 7 Cir., 404 F.2d 652 (1968).[1a]

Reference to claim 34 sheds particularly relevant light on the scope to be afforded claims 35 and 36. Claims 34, 35 and 36 were all introduced into the '514 patent simultaneously by an amendment during its pendency in the Patent and Trademark Office. Claim 34 reads as follows:

> 34. A follow-up control system comprising in combination
>
> (a) a pilot device,
>
> (b) a driven object,
>
> (c) driving means for said object,
>
> (d) means responsive to positional disagreement of said pilot device and driven object for controlling said driving means to drive said object toward correspondence with said pilot device, and
>
> (e) *means responsive to the rate of change of torque of said driving means for controlling said driving means to prevent hunting.* (emphasis added)

The last element of claim 34 is couched in terms of a means-plus-a-function statement. In compliance with 35 U.S.C. § 112,[2] this element must be interpreted as including all disclosed elements necessary to perform the stated function of preventing hunting. *See also Technitrol, Inc. v. Control Data Corp.,* 394 F.Supp. 511, 185 USPQ 801 (D.Md.1975), *vacated on other grounds,*

---

**1a.** Plaintiff insists that the figure 55, being somewhat larger, was intended to include transformers 75 and 81, but the spacing and configuration on Figure 1 (of the patent) goes against that contention. Figure 55 seems clearly to include only the two bridges in the "anti-hunting square" (so described at col. 12, line 37, of the specification). Plaintiff also says that the paragraphs of the specification which describe transformers 75 and 81 are part of the description of the "anti-hunting means" 55 because they follow immediately upon the paragraphs referring to the "anti-hunting means." But we think that those subsequent paragraphs (which do not refer to "anti-hunting means") cannot fairly be read as an integral part of the disclosure of the "anti-hunting means"; rather

they describe separate parts of the invention and seem to us to characterize transformers 75 and 81 as connecting devices outside of the "anti-hunting means." [footnote by the court].

**2.** The third paragraph of 35 U.S.C. § 112 (1970) (amended 1975) reads as follows:

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

550 F.2d 992 (4th Cir. 1977). By reference to the specification, it is clear that the claimed means includes input transformer 81 and its unmarked shunt resistance, anti-hunting means 55 and output transformer 75.

As a cursory comparison of claim 34 with both claims 35 and 36 reveals, this last element is one of the distinctions between the claims in issue and claim 34. Claim 34 also recites a single means clause for determining the error and controlling the object drive means whereas claims 35 and 36 recite both a positional disagreement determining means and a control means for the drive means. Otherwise, claims 34, 35 and 36 are basically identical in language.

■ To sustain plaintiff's position that element (f) of claims 35 and 36 structurally includes more than just anti-hunting means 55, would require the court to ignore the differences in language between the means to prevent hunting of claim 34 and the anti-hunting means of claims 35 and 36. The difference in language exists and cannot be regarded as meaningless, especially when the patentee himself has repeatedly used the phrase anti-hunting means to refer only to structure 55 of the Fig. 1 embodiment. When a "means" term is employed in a claim, it is ordinary and customary to interpret that language as an attempt to use means-plus-a-function terminology as allowed by 35 U.S.C. § 112. However, words used in a patent cannot be given their ordinary and accustomed meaning where it appears from the patent that the inventor has attached some different and/or specific meaning to them. *Harrington Mfg. Co. v. White,* 323 F.Supp. 1345, 1353, 169 USPQ 193, 200 (N.D.Fla.1971), *rev'd on other grounds,* 475 F.2d 788 (5th Cir.), *cert. denied,* 414 U.S. 1040, 94 S.Ct. 542, 38 L.Ed.2d 331 (1973).

Claim 2 of the '514 patent is also useful in establishing the meaning of terms used in, and the permissible scope of, coverage to be afforded to claims 35 and 36. That claim recites, *inter alia:*

means responsive to changes in said current, and anti-hunting means controlled

by said current change responsive means for modifying said alternating voltage and reducing the magnitude of said current in accordance with changes in said direct current as said devices approach correspondence.

A careful study of the claims in light of the '514 specification reveals that claim 2 especially recites and claims the transformer 81 and the anti-hunting means 55. Particularly, transformer 81 is characterized in claim 2 as "means responsive to changes in said current." Accordingly, it is abundantly clear that the phrase "anti-hunting means" was not intended to include transformer 81. Plaintiff's present argument that the phrase "anti-hunting means" is intended to cover transformer 81, anti-hunting means 55, and transformer 75 in claims 35 and 36 takes on a particularly hollow ring in view of the obvious intent that the phrase "anti-hunting means" covers something less than that combination of elements in claim 2. To be consistent with plaintiff's own use of terms in other claims of the same patent, it is essential in interpreting claims 35 and 36 that the term "anti-hunting means" be restricted to the structure borne by the number 55 in Fig. 1 of the '514 patent and not include transformer 81.

In sum, it is concluded that element (f) of both claims 35 and 36 structurally cover no more than anti-hunting means 55 for to do otherwise would enable a patentee to define his invention in one way while seeking allowance of a patent from the Patent Office and in another way while seeking to have the patent enforced by the courts.

■ Where, as in the instant case, the patentee has defined a term and the Patent and Trademark Office has accepted that definition as evidenced by the file wrapper, the same definition should be applied by the courts. *Kaiser Industries Corp. v. McLouth Steel Corp.,* 400 F.2d 36, 49, 158 USPQ 565, 578 (6th Cir. 1968), *cert. denied,* 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124.

Interpreting claims 35 and 36 in light of the above analysis dictates that anti-hunt-

754

ing means 55 be directly connected to the direct current drive motor 12. Moreover, in such a combination, since transformer 81 would not be present to block steady start motor currents, the anti-hunting means 55 would generate a modifying signal regardless of whether or not the drive motor current was changing or constant. In other words, anti-hunting means 55 would respond not only to changes of torque, but to all currents supplied to the direct current drive motor.

■ However, all claim limitations must be considered in determining the scope and manner of operation of a claim. As the following analysis will show, the limitations imposed in both claims 35 and 36 on anti-hunting means 55, i. e., that it be responsive to or actuated in accordance with the rate of change of torque of the direct current drive motor, requires that a modifying signal not be generated under constant drive motor current conditions.

Turning again to the patent specification, it is necessary to reemphasize that col. 8, line 66, to col. 9, line 3, which was reproduced *supra,* during an earlier discussion of the '514 patent, clearly states that anti-hunting means 55 is responsive to the rate of change of the drive motor torque. From this it must be concluded that the patentee intended to limit the operation of anti-hunting means 55 to situations wherein the drive motor current was changing. That plaintiff intended the '514 invention to operate only in response to changes in the drive motor current is further gleaned from a review of the prosecution history.

During the prosecution of the application upon which the '514 patent is based, original claim 5 was rejected as fully met by United States Patent No. 1,684,137 to Mittag, United States Patent No. 1,684,138 to Nixdorff, and French Patent 703,178 to Sperry. In response to the rejection, the claim was amended to provide anti-hunting means responsive "only to changes in said direct current." Counsel argued that the above change distinguished his invention over the references for the following reasons:

In the Mittag patent the anti-hunting motor 63 is continuously responsive to the voltage of the driving motor 12 irrespectively of whether the voltage remains constant or changes. This is likewise true of the Nixdorff patent in which the coils 56–59 inclusive are connected across the field and armature terminals of the driving motor 12.

Applicant's system in which the anti-hunting means respond only to changes in the current supplied to the driving motor 12 is believed to be superior to the systems disclosed in the Mittag and Nixdorff patents and since this feature is clearly specified in claim 5 as amended, it is accordingly believed that this claim will be found to be clearly allowable.

Apparently the patent examiner did not fully appreciate the meaning of plaintiff's remarks, however, for he continued the rejection and noted that it would require no invention to make the anti-hunt device either current or voltage responsive since in Nixdorff voltage and current are proportional once motor speed is established. Claim 5 was additionally rejected as fully met by United States Patent No. 1,811,860 to Morton which showed a current-responsive anti-hunting device.

In response, plaintiff again emphasized that the claim was drawn to anti-hunt means responsive only to changes in the motor current, thus excluding response to constant drive motor currents.

Patent claims 34, 35 and 36, submitted during examination as application claims 36, 37 and 38, were added to the application by amendment. In describing the subject matter of the claims, plaintiff noted that:

As pointed out on page 15, lines 10–20 inclusive, applicant's anti-hunting system is responsive to the rate of change of torque of the driving means. *Each of the three added claims 36, 37, and 38 is limited to this specific feature.* (emphasis added)

Lines 10–20 of p. 15 of the application correspond to col. 8, line 66, to col. 9, line 3, of the issued patent, which describes the rate

of change of torque in terms of the action of transformer 81.

The clear import of the '514 specification, as well as plaintiff's actions during prosecution of the application through the Patent and Trademark Office, dictate that element (f) of both claims 35 and 36 is structurally limited to anti-hunting means 55. It is equally clear that anti-hunting means 55 was intended to generate a modifying signal only during changing drive motor current conditions.

### Claims 35 and 36 are Inoperative

■ Having concluded the anti-hunting means of claims 35 and 36 is a specific recitation of anti-hunting means 55, which responds only to changes in the direct current drive motor current, the conclusion is inescapable that both claims 35 and 36 fail to comply with 35 U.S.C. § 112 and are accordingly invalid.

Claims 35 and 36 fail to structurally recite, in any form, transformer 81. This element is an essential element of the combination for without transformer 81, or some equivalent means, the claimed combination is inoperative since there would be nothing to prevent the generation of a modifying signal by anti-hunting means 55 under constant current drive motor conditions. Since the combination as claimed is inoperative for its claimed purpose, the patentee has failed to distinctly claim the disclosed invention as required by the second paragraph of 35 U.S.C. § 112. *Wilson v. Midwest Folding Products Mfg. Co.,* 175 USPQ 649, 656 (N.D.Ill.1972); *Shelco, Inc. v. Dow Chemical Co.,* 322 F.Supp. 485, 517, 168 USPQ 395, 415 (N.D.Ill.1970), *aff'd,* 466 F.2d 613 (7th Cir.), *cert. denied,* 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972). Specifically, the anti-hunting means 55 cannot be and is not responsive only to the rate of change of the drive torque absent some element *i. e.,* transformer 81, for restricting the drive motor inputs thereto. A claim to be valid must recite a structure that is capable of performing its purported function. *Blohm & Voss AG v. Prudential-Grace Lines, Inc.,* 346 F.Supp. 1116, 1130, 174 USPQ 484, 496 (D.Md.1972), *rev'd on other grounds,* 489 F.2d 231 (4th Cir. 1973), *cert. denied,* 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974). Accordingly, claims 35 and 36 are invalid.

### Patent No. 2,414,685 *

United States Patent No. 2,414,685, hereinafter referred to as the '685 patent, was issued to Dr. E.F.W. Alexanderson, Dr. Martin A. Edwards and Mr. Kenneth K. Bowman on January 21, 1947, on an invention entitled "Follow-Up Control System."

The invention relates to position control systems for maintaining two objects in positional correspondence. Such systems generally comprise a pilot device, a driven object, selsyns, or similar devices for detecting the positional disagreement between the pilot and object, and structure for responding to the detected positional disagreement or error and moving the driven object into correspondence with the pilot.

The invention disclosed in the '685 patent relates to electrical servomechanisms for position control which utilize a compensated armature-excited dynamo-electric machine, described in detail hereinbelow, for supplying current to a d. c. drive motor for moving the driven object into correspondence with the pilot. The dynamo-electric machine is used as an alternative to conventional electronic tube amplifiers.

In one embodiment of the invention, high and low speed selsyn devices are connected between a pilot device and driven object for detecting and responding to the positional disagreement or mismatch therebetween. A Wheatstone bridge is suitably connected to the selsyn network such that a portion of the bridge is unbalanced in response to the direction and magnitude of the detected error. A voltage is thus generated across the bridge which is impressed on the control field winding of a compensated armature-excited dynamo-electric machine.

---

* Plaintiff does not seek review of the adverse holding of the trial judge with respect to Patent No. 2,414,685.

The disclosed dynamo-electric machine is provided with a pair of load brushes arranged to commutate on a control or load axis and a pair of brushes arranged to commutate on a primary or short-circuit axis which is perpendicular to the control axis.

The brushes on the control axis are connected across the armature of a d. c. motor which drives the driven object. The brushes on the short-circuit axis are short-circuited by an appropriate winding.

The total flux on the control axis of the dynamo-electric machine is produced by the control field winding, the armature reaction of the current on the control axis, and a compensating field winding connected in series between the load brushes and the d. c. motor. The control axis flux gives rise to a voltage on the short-circuit axis which generates a short-circuit current.

The total flux on the short-circuit axis is produced by the armature reaction of the current on the short-circuit axis and a shunt field winding. The short-circuit axis flux produces a voltage across the control axis which gives rise to a load current for application to the d. c. motor.

Without the series compensating field winding on the control axis, the armature reaction flux of the load current, which opposes the control flux generated by the control field winding, would minimize the flow of current through the short-circuit path. However, since the flux generated by the compensating field winding is in line with the control flux, it opposes the armature reaction flux. In this manner, only a small residual of power input is required of the control field winding to generate an effective short-circuit current.

The result is that the control field winding turns can be reduced relative to conventional dynamo-electric machines. Moreover, the inductance of the machine is reduced, thus improving the machine's speed of response. A high-gain power output is also achieved.

The amplified output from the dynamo-electric machine is applied to the armature of the d. c. motor for driving the object into positional correspondence accurately, quickly and in a stable manner.

A second disclosed embodiment of the '685 patent is quite similar to the system described above, with the exception that electronic tubes are substituted to perform the functions of the Wheatstone bridge arrangement.

### The Issues

Plaintiff has alleged unauthorized manufacture and use by the defendant of the inventions defined by claims 7 and 11 of the '685 patent. In response, defendant has asserted the defenses of invalidity and non-infringement of the '685 patent, implied license to the inventions defined by the claims, failure to mark under 35 U.S.C. § 287 (1970), and, with respect to at least one of the accused devices, expiration of the statute of limitations. Since, as is explained more fully hereinbelow, it is concluded that the '685 patent is invalid, it is not necessary to address the remaining defenses asserted.

 Defendant challenges the validity of claims 7 and 11 on the single statutory ground of obviousness, 35 U.S.C. § 103. For reasons which follow, it is concluded that the inventions defined by claims 7 and 11 of the '685 patent would have been obvious to one of ordinary skill in the art at the time the inventions were developed and are therefore invalid.

### Scope of Claims 7 and 11 of the '685 Patent

 The first necessary step in properly adjudicating the validity of patent claims is to establish their proper scope. It has long been recognized that the claims of a patent are the measure of the grant to the patentee. *See Strumskis v. United States,* 474 F.2d 623, 200 Ct.Cl. 668, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973). Nevertheless, the Supreme Court, in a series of cases stretching back to the early part of this century, has established that the claims of a patent are to be construed in light of the specification

and both are to be read with a view to ascertaining the invention. *See,* e. g., *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 61 L.Ed. 871 (1917); *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572, 148 USPQ 479, 482 (1966).

Indeed, this court, in *Autogiro Co. of America v. United States,* 384 F.2d at 396–97, 181 Ct.Cl. at 61–2, explained the necessity for interpreting claims in light of the specification:

Claims cannot be clear and unambiguous on their face. A comparison must exist. The lucidity of a claim is determined in light of what ideas it is trying to convey. Only by knowing the idea, can one decide how much shadow encumbers the reality.

The very nature of words would make a clear and unambiguous claim a rare occurrence.

. . . The dictionary does not always keep abreast of the inventor. It cannot. Things are not made for the sake of words, but words for things.

. . . . .

The necessity for a sensible and systematic approach to claim interpretation is axiomatic. The Alice-in-Wonderland view that something means whatever one chooses it to mean makes for enjoyable reading, but bad law. Claims are best construed in connection with the other parts of the patent instrument and with the circumstances surrounding the inception of the patent application.

Bearing these principles in mind, attention is focused on claims 7 and 11 of the '685 patent, whose elements appear below in lettered subsections for ease of analysis and reference:

7. In a follow-up control system having

(a) a pilot device and

(b) driven object, the combination with

(c) a direct-current electric motor for driving said object, of

(d) an armature excited dynamo-electric machine for supplying current to said motor, said machine having

(e) a control field winding,

(f) a pair of load brushes connected to said motor and arranged to commutate on said control axis,

(g) a pair of short-circuited brushes arranged to commutate on an axis at an angle with said control axis, and

(h) a series compensating field winding on said control axis having ampere turns equal to between 75 per cent and 125 per cent of the armature ampere turns, and

(i) means responsive to positional disagreement of said pilot device and driven object for supplying current to said control winding thereby to cause said motor to drive said object toward correspondence with said pilot device.

* * * * * *

11. In a follow-up control system having

(a) a pilot device and

(b) driven object, the combination with

(c) a direct-current motor for driving said object, of

(d) an armature excited dynamo-electric machine having

(e) a control winding and

(f) a pair of load brushes arranged to commutate on the axis of said winding and connected to supply current to said motor,

(g) a pair of short-circuited brushes arranged to commutate on an axis at an angle with said control axis and

(h) a series field winding for compensating armature reaction on said control axis,

(i) electric valve apparatus for supplying a control current to said control winding, and

(j) means responsive to positional disagreement of said pilot device and driven object for controlling said valve apparatus to supply current to said control winding of a polarity depending upon the relative positions of said device and object thereby to cause said motor to drive said object

toward correspondence with said pilot device.

On its face, claim 7 is directed to a follow-up position control system comprising the combination of a pilot device and a driven object, a d. c. motor for driving the object, an armature-excited dynamo-electric machine equipped with a series compensating winding whose ampere turns range from 75 to 125% of the armature ampere turns for supplying current to the d. c. motor and means responsive to the positional error between the pilot and object for supplying current to the control winding of the dynamo-electric machine for elimination of the positional error. Claim 7 contains the only recitation of the percentage compensation afforded by the series field winding to be found anywhere in the '685 patent.

Similarly, claim 11 is directed to a follow-up position control system comprising the combination of a pilot device and driven object, a d. c. motor for driving the object, a compensated armature-excited dynamo-electric machine for supplying current to the d. c. motor, electric valve apparatus for supplying current to the control winding of the dynamo-electric machine and means responsive to the positional error between the pilot and object for control of the electric valve apparatus to eliminate the positional error. The dynamo-electric machine of claim 11 does not require any particular degree of compensation on the control axis but only broadly calls for "a series field winding for compensating armature reaction * * *."

Plaintiff urges that claims 7 and 11 are narrower in scope than their plain language suggests. Specifically, the threshold question to be decided is whether claims 7 and 11 are drawn to a follow-up position control system utilizing an armature-excited dynamo-electric machine for current supply having full or 100% compensation on its control axis. Stated differently, the issue is whether claims 7 and 11 only cover an armature-excited machine with a series compensation winding whose ampere turns are equal to 100% or more of the armature ampere turns, or are broad enough to cover an armature-excited machine with a series compensating winding whose ampere turns are less than the ampere turns of the armature.

This court has, to be sure, had occasion to apply a narrower interpretation to claims, when read in light of the specification, than the claim language would otherwise seem to require. See Roberts Dairy Co. v. United States, 530 F.2d 1342, 208 Ct.Cl. 830 (1976). However, having carefully reviewed the '685 patent and its file history, we well as the contentions of plaintiff, it is concluded that claims 7 and 11 cannot properly be construed as limited exclusively to follow-up position control systems utilizing an amplidyne, i. e., an armature-excited dynamo-electric machine with 100% or more compensation.

The series compensating field winding is described in the '685 patent specification at col. 3, lines 42–8:

The series compensating field is used principally to reduce the control power. It is connected so that the series field ampere turns oppose the armature reaction turns along the control axis and leave only a small residual to be overcome by the control field. In this way the power amplification is increased many times.

The performance of the disclosed dynamo-electric machine is discussed at col. 4, lines 7 to 13, of the '685 specification:

The predominant characteristics of machine 14 are rapid response, and low ratio of control watts to load watts, e. g. an amplification as high as 25,000:1.

No percentages of compensation are disclosed, although the 75 to 125% figure of claim 7 was part of the original claim language and thus is part and parcel of the original disclosure. Bocciarelli v. Huffman, 232 F.2d 647, 43 CCPA 873, 109 USPQ 385 (1956). Nevertheless, this range of compensation, even when read into the '685 specification, cannot be concluded to be any more than exemplary or preferred. There is no indication in any part of the '685 patent which would justify treating the 75 to 125% limitation as exclusive or critical.

Plaintiff urges, through its expert witness Dr. Chestnut, that the phrase "having ampere turns equal to between 75 per cent and 125 per cent of the armature ampere turns," which appears in claim 7, is a technician's manner of saying 100 ± 25% compensation. In other words, it is a compromise between the theorist who desires 100% compensation and the technician who realizes it is not always achievable.

Such an interpretation cannot be gleaned from the patent or its file history. Indeed, if anything, a contrary interpretation is demanded from the above-quoted excerpts from the patent in suit. Plaintiff has failed to suggest any persuasive reasons for interpreting the 75 to 125% limitation that appears in claim 7 in any manner other than that dictated by its clear language. Specifically, this phrase is concluded to recite a range of compensation from 75 to 125% and, accordingly, claim 7 broadly covers partial, as well as 100% or greater, compensation.

Plaintiff would have the court conclude that the disclosure of "an amplification as high as 25,000:1" is tantamount to stating that the dynamo-electric machine has 100% compensation on the control axis. Quite clearly, however, the prefatory language "as high as" dispels any notion that a specific percentage compensation is intended and suggests a degree of flexibility which results in a range of gains with a ceiling of 25,000:1.

Plaintiff also points to the disclosure that the series field winding leaves "only a small residual to be overcome by the control field" as indicating 100% compensation. The phrase "a small residual" is relative. It is impossible to base a conclusion limiting claims 7 and 11 to 100% compensation on the sole basis of such a relative term, especially since plaintiff has not adequately demonstrated that partial percentages of compensation do not likewise leave what might be termed a small residual of power to be overcome by the control field.

 The patentees, through their own action during the prosecution of the application through the Patent Office, did not expressly limit the claims in suit to 100%

series compensation. Moreover, of equal significance is the fact that the specification does not clearly disclose the intention of the patentees to require the use of a series compensating winding having ampere turns equal to those of the armature. Their assignee will not now be allowed to retreat to a narrower reading than that obviously urged during the prosecution of the patent by referring to the specification, especially when the specification does not expressly support the desired reading, and plaintiff is instead forced to rely upon an assortment of vague implications from the construction of a few sentences in the specification. *Mueller Brass Co. v. Reading Indus.*, 352 F.Supp. 1357, 1365, 176 USPQ 361, 367 (E.D. Pa.1972), *aff'd*, 487 F.2d 1395, 180 USPQ 547 (3d Cir. 1973).

Additional relevant factors militate against limiting the scope of claims 7 and 11 to require 100% or greater compensation on the control axis.

To begin, it was established at trial that the amplidyne, a dynamo-electric machine which has 100% or greater compensation on the control axis, is characterized by a variable current output which responds to changes in the load. This variable current characteristic is not present in dynamo-electric machines which have less than 100% compensation (partial compensation), and such machines instead produce a constant current output independent of the load. The output current of partially compensated machines can only be varied by changing the ampere windings on the control winding of the machine.

Project reports filed with the General Electric Co. patent department prior to the January 21, 1939, filing date of the '685 patent demonstrate that the patentees, at that time, were fully aware of the difference in current output characteristics between partially and fully compensated machines. Nevertheless, the '685 patent specification, while referring to the prior art problem of independent load voltage and current characteristics in dynamo-electric machines, does not contain any discussion of the load voltage and load current character-

istics of the disclosed compensated machine. In other words, the variable current output characteristic of amplidynes is not mentioned or discussed in the patent claims, specification, or file history of the '685 patent.

Significantly, 5 months later, in an application entitled "Dynamoelectric Machine" which matured into United States Patent No. 2,227,992, hereinafter referred to as the '992 patent, on January 7, 1941, Drs. Alexanderson and Edwards disclosed fully a dynamo-electric machine having variable current output characteristics, high amplification ratio and fast response time. The series compensating field winding in the '992 patent was disclosed at p. 2, col. 2, lines 52–60, as—

> * * * arranged substantially to neutralize the magnetic back coupling of electric current in the secondary circuit of the armature with the primary armature circuit by substantially neutralizing the armature reaction flux along the secondary axis. This field exciting winding 29 is adapted to neutralize substantially the armature reaction 22 under all load conditions, * * *.

Thus, couched in terms of substantial neutralization of the control axis armature flux and variable current output characteristics, it is clear that the series field winding of the '992 patent was disclosed as providing 100% compensation of the control axis armature reaction flux and was, in essence, a disclosure of the amplidyne.

■ As an aid in determining the true scope to be accorded claims 7 and 11 of the '685 patent, it is useful to look to the subsequently filed '992 patent to assist the court in understanding what it was that the inventors deemed of substantive importance in the earlier patent. *Jacwil Mfrs. v. Batesville Casket Co.*, 311 F.2d 38, 42, 136 USPQ 42, 45 (7th Cir. 1962), *cert. denied*, 372 U.S. 942, 83 S.Ct. 937, 9 L.Ed.2d 968 (1963).

Viewing the '685 disclosure in the context of all the factors discussed above, as well as what was disclosed in the '992 patent, it is concluded that the inventors' intent in the earlier '685 patent was to disclose a position follow-up control system utilizing a compensated armature-excited dynamo-electric machine for power amplification without limitation as to the percentage compensation. Such is concluded to be a reasonable construction of the '685 specification, which, on one hand, talks of opposing armature reaction, achieving gains as high as 25,000 to 1 and leaving but a small residual of power to be overcome, but, on the other hand, fails to refer to 100% compensation per se or to substantial neutralization of control axis armature reaction flux, operating conditions clearly called for in the '992 patent. This is especially meaningful where the inventors were aware of the distinctions prior to filing the '685 application but made no reference to them in the '685 application.

■ It is, therefore, concluded that the compensation of the dynamo-electric machine set forth in claim 7 ranges from 75 to 125% while the compensation of the dynamo-electric machine set forth in claim 11 of the '685 patent has no percentage limits.[3]

3. Although not raised by the parties, the validity of claim 7, in view of the requirements of 35 U.S.C. § 112, is questionable. Specifically, the range of compensation of 75 to 125% recited in claim 7 is not supported by the '685 specification. Although the specification does not explicitly limit the degree of compensation, a careful and reasonable interpretation of the specification dictates that the broadest reasonable range that can be assumed to be disclosed is compensation ranging from a minor amount to less than 100%. It would not be reasonable to assume that, absent explicit language, a compensation of 100% or greater was intended. The 75 to 125% range disclosed in an original claim finds no support and, in fact, to the extent it refers to 100% or greater compensation, is contrary to the teachings of the specification. The specification, moreover, was never amended during prosecution to include such a range.

Claim limitations defining the subject matter of an invention can never be disregarded and, since the specification cannot be reasonably interpreted to support the full range of compensation set forth clearly by claim 7, the claim may very well be invalid for undue breadth. *See In re Sabatino*, 480 F.2d 911, 178 USPQ 357 (Cust. & Pat.App.1973).

## Obviousness

Having established the scope to be afforded the claims in suit, attention is next directed to defendant's argument that the claims are invalid because they fail to comply with the statutory standard set out by 35 U.S.C. § 103 (1970).[4] The validity of claims 7 and 11 must be adjudged in the context of the guidelines enunciated in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), wherein the Supreme Court formulated the test of obviousness based upon a consideration of the relevant prior art, the differences between the claims in issue and that prior art, and the level of ordinary skill in the relevant technological art.

Defendant asserts the relevance of the following seven prior art references, only one of which, French Patent No. 812,451 to Japolsky, was cited by the patent examiner during the prosecution of the application which matured into the '685 patent:

| | |
|---|---|
| U.S. Patent Re. 16,667 | Hewlett, *et al.* |
| French Patent 812,451 | Japolsky |
| U.S. Patent 1,684,132 | Hewlett, *et al.* |
| U.S. Patent 1,985,981 | Edwards |
| U.S. Patent 1,684,138 | Nixdorff |
| U.S. Patent 2,412,864 | Bowman |
| British Patent 420,167 | Pestarini |

The pertinence of those references not considered during the examination process seriously weakens the usual presumption of validity afforded all patents under 35 U.S.C. § 282 (1970 & Supp. V 1975). *Bolt, Beranek & Newman, Inc. v. McDonnell Douglas Corp.*, 521 F.2d 338, 340, 187 USPQ 142, 144 (8th Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976); *Ellicott Mach. Corp. v. United States*, 405 F.2d 1385, 186 Ct.Cl. 655 (1969). In addition, it should be noted that all of the above patents, except Japolsky and Pestarini, were assigned to and owned by plaintiff corporation.

Six of the references introduced into evidence by defendant provide ample insight into the general state of the position control art at the time the '685 invention was developed.

The French Patent 812,451, granted to Nicholas Japolsky on February 1, 1937, discloses a system for maintaining two objects in positional correspondence. Displacement recorders detect the positional disagreement between the two objects and forward an error signal to a dynamo-electric generator which amplifies and supplies current to a d. c. motor for driving one object into positional correspondence with the other.

Dr. Martin A. Edwards taught a basic positional servo for maintaining two objects in positional correspondence wherein selsyns provide a voltage signal indicative of positional error between the two objects which is converted to an amplified current by appropriate electric valves. The amplified current is then used to drive a d.c. motor for controlling the movement of one object to achieve correspondence with the other. United States Letters Patent No. 1,985,981 issued to Dr. Edwards on January 1, 1935.

United States Reissue Patent No. 16,667 was issued to Edward M. Hewlett, *et al.*, on July 5, 1927, for an invention entitled "Means for Reproducing Position." The patent discloses yet another system for maintaining positional correspondence between two objects. A voltage signal indicative of positional error between the two objects is produced by a pair of induction or selsyn devices connected therebetween. The signal is amplified by a pair of electron discharge amplifier tubes and then impressed on the grid of a second pair of electron discharge tubes for supplying amplified current to the armature of a d. c. motor which drives one of the objects into correspondence with the other. The specification discloses that additional amplifica-

---

4. 35 U.S.C. § 103 (1970) provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

tion of the control current may be obtained by the use of one or more electric generators for further amplification of the current output from the electric tubes.

Hewlett, et al., Patent No. 1,694,132, issued on September 11, 1928, discloses a position control system which teaches the same relevant position control apparatus as the Hewlett, et al., Reissue Patent.

United States Patent No. 1,684,138 issued to Samuel P. Nixdorff on September 11, 1928. Nixdorff developed a position control system similar to those above. Disclosed in the patent was the teaching that, after amplification by a pair of electric tubes, the gain of a position control system could be further enhanced by using a pair of cascaded generators to further amplify the current from the electric tubes before application to the drive motor for the driven object.

Yet another position control system is shown in United States Patent No. 2,412,864, which issued to Kenneth K. Bowman on December 17, 1946. The patent is based on an application filed in the United States Patent and Trademark Office on August 20, 1937. As disclosed in the patent, a driven object is controlled by a d.c. motor which is in turn responsive to voltage signals from a Wheatstone bridge. The bridge generates voltage signals indicative of positional disagreement between the driven object and a pilot device. Selsyn devices provide fine and coarse control and are connected to the two objects such that they provide a signal to the bridge indicative of the positional error. The error signal is modified by an anti-hunt network prior to application to the drive motor. Bowman, et al., essentially teach the same system shown by the '685 patent except for amplification of the error signal by a dynamo-electric machine.

Both Hewlett, et al., patents and the Nixdorff patent thus teach a follow-up control system which includes a motor for driving an object into positional correspondence with a pilot device in response to a signal indicative of positional disagreement. However, these prior art patents all disclose the use of electric tubes or cascaded genera-

tors for supply of current to the drive motor whereas claim 11 calls for a compensated armature-excited dynamo-electric machine to perform that function.

Similarly, all of the references previously discussed teach follow-up control systems which include a motor for driving an object, i. e., a gun or search light, into positional correspondence with a pilot device in response to a signal indicative of positional disagreement. The prior art, however, utilizes electronic tubes, cascaded generators, or a basic dynamo-electric machine for supplying current to the drive motor while claim 7 calls for a 75 to 125% compensated armature-excited dynamo-electric machine for such current supply.

Resolution of the obviousness of claims 7 and 11 involves slightly different questions. With respect to claim 11, it is necessary to determine whether or not it would have been obvious to one of ordinary skill in the position follow-up control art, at the time the '685 invention was made, to utilize an armature-excited dynamo-electric machine with any degree of compensation, for supplying current to the driving motor of a position control system such as shown by the Hewlett, et al., and Nixdorff references. With respect to claim 7, it must be determined whether or not it would have been obvious to one of ordinary skill in the position follow-up control art at the time of the invention of the '685 patent to utilize an armature-excited dynamo-electric machine having either partial or 100% or greater compensation on the control axis for supplying current to the drive motor of a position control system such as those illustrated by any of the references described above. As will be seen, it is concluded that both claims 7 and 11 are invalid because they fail to meet the requirements of 35 U.S.C. § 103.

An analysis of British Patent Specification 420,167 by Giuseppe Massimo Pestarini, received in the United States Patent and Trademark Office Library on January 8, 1935, shows that compensated armature-excited dynamo-electric machines were known in the art at the date of filing of the

application which matured into the '685 patent. The Pestarini machine is compensated on the control axis by a compensating field winding interposed in series between the load and load brushes. The effect of the winding is described at p. 4, lines 20 to 27, of the Pestarini patent:

The coils [series compensating windings] are wound so as to excite a magnetic flux in a direction to assist the flux produced by the main field coils 14, 15, 16, 17. This compensating winding partially neutralises [sic] the armature flux along the axis b, d and enables the ampere turns of the coils 14–17 to be reduced.

The patent further states at p. 4, lines 95 to 103, that:

The current in the load circuit 7, which passes through the coils indicated by C [series compensating windings] produces a flux which assists the flux produced by the windings indicated by SW [main field winding] and consequently reduces the amount of energy required to be supplied from the source connected to the terminals 8, 9 of the winding SW.

Pestarini teaches an armature-excited dynamo machine having a series compensating winding which partially neutralizes the armature reaction flux. The result, as is the case in machine 14 of the '685 patent, is a reduction in the number of ampere turns of the control winding of Pestarini's motor. The reduction in ampere turns of the control winding reduces the inductance of the system to improve the system's time constant or response. In addition, the system's gain is greatly increased.

 As is the case generally, whenever a 35 U.S.C. § 103 obviousness test is being applied, it is critical to the analysis to deliberately guard against using the teaching of the patent in suit in arriving at the conclusions. The above observations regarding the Pestarini patent, as well as the following disclosures, insure against any misapplication of the process and guarantees the integrity of the results reached in this instance.

While Pestarini does not teach specific applications of his machine, he does broadly suggest its utility "where high values of current are required in the consumption circuit." Indeed, a machine for improving system gain, which finds particular use where high current outputs are needed, is disclosed. Certainly, the Pestarini patent discloses a solution to overcoming a number of the below-quoted prior art deficiencies outlined at col. 1 of the '685 patent:

Heretofore, follow-up systems have been utilized in which the motor was supplied from electric valves. Although such systems possess a sufficiently high degree of accuracy, they have other limitations, and there are many applications in which it is desirable that means other than electric valves, e. g., dynamo-electric machines, be utilized for supplying current to the driving motor. However, dynamo-electric machines have windings that contain inductance and inductance causes delayed or lagging currents. The result of this, especially in a follow-up system having several stages of amplification, is that the restoring force of the driving motor is still active when the driven object reaches correspondence with the pilot device, and this produces generation of self-excited mechanical oscillations usually referred to as "hunting." Accordingly, a further object of this invention is the provision of a follow-up control system in which the driving motor is supplied from a dynamo-electric machine and in which means are provided for eliminating hunting without sacrificing sensitivity of the system.

Plaintiff, in arguing against the obviousness of combining Pestarini with the position control references of record, points out that none of the prior art systems suggest the use of an armature-excited dynamo-electric machine for any purpose. Further, plaintiff urges that not only does Pestarini not suggest any specific application for a dynamo-electric machine, he clearly does not teach that it can be used as an amplifier in a position control system.

The fallacy of these contentions is that they ignore the level of skill in the art as demonstrated by patents such as those is-

sued to Hewlett, *et al.*, and Nixdorff. Those patents illustrate that the general level of skill in the position control art had developed to the point where position control systems utilizing a variety of amplifiers for amplification of the positional disagreement signal were abundant. Moreover, it was during this time frame and in this technical environment that Pestarini disclosed his armature-excited dynamo-electric machine for use where high values of output current were necessary. One embodiment of his disclosure suggests the use of a compensating winding on a control axis for opposing the armature reaction flux of the load current and reducing the control winding requirement. Implementation of such an embodiment results in improved system gain. The specification of the '685 patent also, as has been previously explained, speaks to prior art shortcomings such as the use of electronic tube amplifiers and the high inductance in windings of prior art dynamo-electric machines.

Given this general state of the art, it would have been clearly obvious to one of ordinary skill in the art, at the time of the '685 invention, to use the Pestarini compensated armature-excited dynamo-electric machine as an alternative to electronic tube amplifiers or cascaded generators for power amplification in position control systems such as shown by Nixdorff and Hewlett, *et al.* This is especially true in view of the advantages which Pestarini discloses for his compensated armature-excited machine, *i. e.*, neutralization of the armature flux, reduction of the control winding requirement, and improved system gain over conventional dynamo-electric machines. The substitution of Pestarini would amount to nothing more than the substitution of one well known power amplifier with its attendant advantages for another.

Further, it also would have been obvious to one of skill in the art, at the time of the '685 invention, to vary the compensation as disclosed by Pestarini to any desired percentage that was needed in a particular system to achieve the best required results. Obviously, once the advantages of compensation and its effect on a dynamo-electric machine had been disclosed, the exact degree of compensation would have been no more than a matter of choice based on the particular power output needed and the desired system gain.

It is, accordingly, concluded that it would have been obvious to incorporate Pestarini's compensated dynamo-electric machine in such prior art position control systems as have previously been discussed to obtain a tubeless positional control system which had low inductance, a quick response, and increased power gains.

To the contrary, plaintiff contends that there was no way to have anticipated the advantages of highly improved system gain, improved system time constants, and variable current output, which result from the use of a 100% or greater series compensated dynamo-electric machine in a position control system prior to the teachings of Alexanderson, *et al.* The simple answer to plaintiff's position, as has previously been pointed out in establishing the scope of the claims in suit, is that claims 7 and 11 do not require that the armature-excited dynamo-electric machine be compensated to 100% or greater. Thus, the presence or absence of a variable current output, a characteristic which is peculiar to 100% or greater compensation, is of no moment to deciding whether or not claims 7 and 11 are obvious within the meaning of 35 U.S.C. § 103.

In addition, while Pestarini does not specifically state that a 25,000 to 1 gain can be achieved through the use of his machine, he does teach improved gain per se.

Finally, plaintiff argues that utilization of the Pestarini machine in a position control system would be in direct contravention of the teachings of the Pestarini system. For support, plaintiff contends that the Pestarini machine is only partially compensated in order to provide a constant current output which is proportional to the input signal. Plaintiff, therefore, argues that a fully compensated machine, *i. e.*, 100% or greater compensation, would destroy the constant current characteristic and the intent of the Pestarini patent. Plaintiff's

argument fails for the obvious reason that claims 7 and 11 embrace partial compensation, and this is clearly disclosed by Pestarini.

The conclusion is thus inescapable that it would have been within the ordinary level of skill in the art to use a compensated dynamo-electric machine such as disclosed by Pestarini in any of well-known position control systems discussed hereinabove to reduce the inductance of the system, increase the system's response, and, as well, increase the system's gain. Additionally, since the Pestarini patent teaches that increased system gains would result through the neutralization of armature flux by the use of a compensated field winding, it would have been within the level of ordinary skill in the art to adjust the compensation according to the system's desired gain. Thus, claim 7, which calls for a compensation of 75 to 125% and, as well, claim 11, which does not specify the amount of compensation required, are both invalid in view of the Pestarini teachings when combined with the Hewlett, *et al.*, or Nixdorff systems.

### Patent No. 2,679,138

The third and final patent in suit, United States Patent No. 2,679,138 (hereinafter referred to as the "Kane" patent), was issued to Garold A. Kane on May 25, 1954. The patent was based on an application filed in the United States Patent and Trademark Office on May 19, 1937, and is entitled "Control System."

Plaintiff alleges that the inventions defined by claims 7 and 8 of the Kane patent have been manufactured and/or used by defendant without license or lawful right through the reconstruction of 5"/38 caliber, single Mark 30 gun mounts. Moreover, plaintiff alleges unlawful manufacture and/or use by the United States Government of a multiplicity of accused devices which are alleged to read on the invention defined by claim 17 of the Kane patent. As will be explained hereinbelow, the inventions defined by claims 7 and 17 of the Kane patent are concluded to be invalid. Claim 8 of the Kane patent, on the other hand, is held to be valid.

### The Kane Patent Position Control System

The Kane patent broadly relates to hydraulic follow-up position control systems wherein a hydraulic transmission is utilized to drive a driven object such as a gun into positional correspondence with a pilot device such as a telescope in a stable and accurate manner. Movement of the gun is controlled in response to an error signal representative of the positional disagreement between the gun and telescope. Additionally, hunting by the gun is prevented by providing a modifying signal for the basic error signal which is representative of the first time derivative or rate of change of positional disagreement. The combination of the error signal and its first derivative controls the movement of the gun to assume the desired position in a stable and accurate manner.

The hydraulic transmission is composed of an A-end variable displacement pump and a B-end motor, the output shaft of which is connected through suitable gearing to the gun. The transmission also contains a tilt box, the position of which determines the displacement of the pump. In turn, the tilt box position is controlled by a stroking piston and cylinder. Although not referred to as such in the Kane specification, the hydraulic transmission and the stroking piston comprise the "power drive" of the position control system.

A stroke control valve communicates with the stroking piston and cylinder by means of hydraulic lines. Hydraulic fluid is thus supplied from the stroke control value to one side or the other of the stroking piston and cylinder, to drive the piston, tilt box, transmission and, ultimately, the gun in one direction or the other.

The stroke control valve is in turn operated by a combination of two factors. One factor is the basic error signal representing the positional disagreement between the telescope and the gun. Selsyns connected to the telescope through suitable gearing and to the output shaft of the hydraulic transmission generate an error signal repre-

sentative of the positional disagreement between the telescope and gun. The error signal is then amplified. The Kane patent discloses utilizing either an electric valve amplifier or a hydraulic amplifier for this purpose. The hydraulic amplifier comprises a valve and a piston connected in such a manner as to amplify the error signal and supply this amplified error signal to the stroke control valve by way of a rigid pivotal lever connected therebetween.

The second factor making up the control signal to the stroke control valve is a signal which modifies the basic error signal to prevent hunting and provide stable operation. This modifying signal is generated by a hydromechanical lead network composed of a valve and a piston combination connected to the pivotal lever between the hydraulic amplifier and the stroke control valve in such a manner as to modify the basic error signal in accord with the rate of change of positional disagreement between the telescope and gun.

The selsyns, hydraulic amplifier, hydromechanical lead network and the stroke control valve form the "regulator" of the position control system, a term not utilized in the Kane specification but frequently used in the art.

The system operates as a hydraulic follow-up position control system which brings the gun into correspondence with the telescope in an accurate and stable manner.

### Claims 7 and 8

Claims 7 and 8 of the Kane patent are directed to the overall follow-up position control system.

Claim 7 reads as follows, broken down into lettered sections element by element for ease of analysis:

7. A follow-up system for controlling (b) a driven object to move into positional agreement with (a) a pilot device comprising

(c) an hydraulic transmission device for driving said object, said transmission device comprising (d) a variable stroke pump, (e) an hydraulic motor supplied from said pump and (f) a device for controlling the stroke of said pump thereby to control the acceleration of said motor,

(g) means for actuating said stroke varying device comprising (h) a cylinder and (i) a piston movable therein and connected to said stroke varying device,

(j) a valve for controlling the supply of fluid pressure to said piston, and

(k) means responsive to positional disagreement of said pilot device and driven object for opening said valve to admit fluid under pressure to said cylinder to move said piston thereby to cause said motor to drive said object toward correspondence with said pilot device, and

(l) means responsive to the rate of change of said positional disagreement for modifying the opening of said valve to vary the acceleration of said motor in accordance with the rate of change of said positional disagreement.

Similarly, claim 8 reads as follows, broken down into lettered sections element by element:

8. A follow-up system for controlling (b) a driven object to move into positional agreement with (a) a pilot device comprising

(c) an hydraulic transmission device for driving said object, said transmission device comprising (d) a variable stroke hydraulic pump, (e) an hydraulic motor supplied therefrom, and (f) means for varying the stroke of said pump.

(g) means for actuating said stroke varying means comprising (h) a cylinder and (i) a piston movable therein and connected to said stroke varying means,

(j) a valve for controlling the supply of fluid pressure to said cylinder to effect movement of said piston,

(k) means responsive to positional disagreement of said pilot device and driven object for controlling the opening of said valve, and

(*l*) means responsive to the rate of change of said positional disagreement for modifying the opening of said valve, comprising (*m*) a second cylinder and (*n*) piston movable therein, (*o*) a second valve for controlling the supply of fluid to said second cylinder, (*p*) a connection between said second valve and second piston and (*q*) a connection between said connection and said first valve.

Elements (*a*) through (*k*) of both claims 7 and 8 recite essentially the same structure, *i. e.*, a pilot device and driven object, a hydraulic transmission have an A-end pump, a B-end motor and a tilt box for varying the pump displacement, a stroking piston and cylinder for controlling the tilt box, a stroke control valve for controlling the stroking piston and means responding to the positional error for operation of the stroke control valve in accordance with the error signal.

Additionally, claim 7 broadly calls for means responding to the rate of change of positional error for modifying the error signal in accordance therewith. Claim 8 recites this same rate responsive means but goes on to specify that the rate responsive means comprises a second piston and cylinder and a second valve for controlling the supply of fluid thereto with connections between the second valve, second piston and the stroke control valve.

### Validity

Defendant asserts seven United States patents against claims 7 and 8 of the Kane patent, some of which are highly pertinent to the claimed invention and none of which were cited by the patent examiner during the prosecution of the application upon which the Kane patent is based. As stated earlier in this opinion, the usual presumption of validity afforded all patents is inevitably weakened, if not destroyed, in the face of such pertinent prior art. *Bolt, Ber-*

*anek & Newman, Inc. v. McDonnell Douglas Corp.*, 521 F.2d at 340, 187 USPQ at 144; *Ellicott Mach. Corp. v. United States*, 405 F.2d at 1392, 186 Ct.Cl. at 668–69.

■ Defendant contends that the prior art renders the inventions defined by claims 7 and 8 invalid under 35 U.S.C. §§ 102 and 103. As the following analysis will reveal, claim 7 is not anticipated by any prior art under 35 U.S.C. § 102, but is invalid for obviousness under 35 U.S.C. § 103. Claim 8, on the other hand, is concluded to recite a patentable and valid invention.

### 35 U.S.C. § 102(e)

United States Patent No. 2,586,990 (hereinafter referred to as the "990" patent) issued to Edward J. Poitras and James D. Tear on February 26, 1952, for an invention entitled "Control System," and was based on an application filed on April 11, 1935. Defendant contends that the '990 patent anticipates claims 7 and 8 of the Kane patent under 35 U.S.C. § 102(e).[5]

The '990 patent disclosure relates to hydraulic follow-up position controls systems wherein a hydraulic transmission is used to drive a driven object into correspondence with a pilot device. The hydraulic transmission has an A-end variable stroke pump, the displacement of which is governed by the position of a tilt box therein, and a B-end motor, the output shaft of which is connected to the driven object through suitable gearing. A stroking piston and cylinder control the position of the tilt box. In turn, the displacement of the stroking piston is controlled by a stroke control valve, the input to which is a combination of factors.

A basic error signal, representing positional disagreement between the pilot device and driven object, is one of the input factors to the stroke control valve. A pair of cams connected to the pilot device and the output shaft of the hydraulic transmis-

5. 35 U.S.C. § 102(e) (1970 & Supp. V 1975) provides: "A person shall be entitled to a patent unless—

"(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent * * *."

sion moves the valve rod of a pilot valve in proportion to the positional difference between the pilot device and output shaft of the hydraulic transmission. Motion of the pilot valve is imparted to a plunger or piston which, in turn, controls the movement of the stroke control valve by means of hydraulic connections thereto. The pilot valve and plunger form a hydraulic amplifier for the error signal.

The system disclosed by the '990 patent also includes means for modifying the basic error signal, the effect of which is to maintain a stable system and prevent hunting. A needle valve augments the oil volume in the lower chamber of the plunger-piston, in response to movement of the plunger, as a function of the first time integral of the plunger position. Thus, the input to the stroke control valve from the plunger is a function of the error plus the first time integral of the error. Additionally, the movement of the stroking piston causes a change in the oil volume of a chamber located within the stroking piston which ultimately provides a degenerative piston position feedback term to the stroke control valve.

The total control signal to the stroke control valve is representative of the error plus the first time integral of the error minus a feedback term representing stroking piston position.

The '990 patent does not anticipate either claim 7 or claim 8 of the Kane patent under 35 U.S.C. § 102(e). Simply stated, the '990 patent discloses a follow-up system showing all the elements of the claimed systems except, "means responsive to the *rate of change of said positional disagreement* for modifying the opening of said valve to vary the acceleration of said motor *in accordance with the rate of change of said positional disagreement*" (emphasis added) as required by claim 7, See p. 766 *supra*, and as more specifically described in claim 8 of the Kane patent. The '990 patent does not disclose any structure which

responds to the *rate of change* of error for modifying the basic error signal to the stroke control valve. Rather the '990 patent discloses a follow-up system including structure which responds to the *first time integral* of the error and *stroking piston position feedback* for modifying the basic error signal to maintain system stability. To anticipate a claim, a prior art reference must show each and every element claimed. Short of this, anticipation does not exist. *In re Royka*, 490 F.2d 981, 984, 180 USPQ 580, 583 (Cust. & Pat.App.1974).

## Obviousness

Defendant asserts that claims 7 and 8 of the Kane patent are obvious within the meaning of 35 U.S.C. § 103 as a result of the teaching of the '990 patent and the state of the art at the time of the Kane invention. Following the three-level analysis set forth by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. 684, the discussion now focuses on the state of the prior art.

Prior to the Kane invention, it was well known in the position control art that the first time derivative of the positional error could be used to provide and would indeed provide stability in servomechanisms.[6] In September of 1934, H. L. Hazen published an article, entitled *Theory of Servo-Mechanisms*, which showed that not only the first time derivative but higher derivatives as well could be used to improve the stability of follow-up positional servomechanisms.[7]

Indeed, United States Patent No. 2,406,324, which issued to Arthur P. Davis on August 27, 1946 (hereinafter referred to as the "Davis" patent), for an invention filed on September 6, 1933, entitled "Gun Control System", embodies the practical realization of this concept.

The Davis patent discloses a follow-up position control system utilizing a basic error signal representative of positional disagreement between a pilot device and driven

---

**6.** *See* Minorsky, *Directional Stability of Automatically Steered Bodies*, 34 J. Am. Soc'y Nav. Engrs., 280–309 (May 1922).

**7.** *See* finding 200.

object for control of a hydraulic transmission to drive the driven object into correspondence with the pilot device. The system includes an anti-hunt device for modifying the error signal to prevent gun oscillations about the point of correspondence. The anti-hunt device produces a rate of change of error signal for modifying the error signal. While the anti-hunt rate of change device disclosed by Davis is not identical structurally to the piston and valve rate of change mechanism specifically shown in the Kane specification and set forth in claim 8 of the patent, Davis had nonetheless implemented the broad concept of utilizing rate of change of positional disagreement in a follow-up position control system for modifying the basic error signal to prevent hunting by the driven object.

Similarly, United States Patent No. 2,421,230, which issued to George Agins on May 27, 1947, for an invention filed on May 13, 1936, and entitled "Electro-Hydraulic Position Control System" (hereinafter referred to as the "Agins" patent), discloses another practical embodiment incorporating a rate of change of error signal in a follow-up control system utilizing a hydraulic transmission to drive a driven object into positional agreement with a pilot device for modifying the basic error signal and providing stability.

The system disclosed in the Agins patent utilizes positional disagreement between the pilot device and driven object as the basic error signal. Tachometers connected to the pilot device and driven object provide velocity signals which are used to prevent hunting by the driven object. The combined effect of the two velocity signals is to provide a stabilizing input which is a function of the first time derivative of the positional disagreement. Thus, the Agins patent shows yet another system implementing the broad concept of using rate of change of positional disagreement for modifying the basic error input in a follow-up position control system to prevent hunting.

The following patents introduced into the record during trial round out the state of the art at the time of the Kane invention.

United States Patent No. 2,213,968 was granted to Edwin L. Rose on September 10, 1940, for an invention filed on October 29, 1936, entitled "Power Transmission." United States Patent No. 2,189,823 was granted to Harry F. Vickers and Norman B. Frost on February 13, 1940, for an invention filed on August 1, 1935. United States Patent No. 2,343,386 was granted to Messrs. Poitras and Tear on March 7, 1944, for an invention filed on November 14, 1935. Finally, yet another patent, United States Patent No. 2,614,390 was granted to Messrs. Poitras and Tear on October 21, 1954, for an invention filed on January 11, 1935. The teachings of these prior art patents are cumulative to the references described fully *supra*.

Comparing claim 7 with the prior art, it has already been stated that the Poitras '990 patent discloses a follow-up position control system which includes all the elements of claim 7 except for element (1), which calls for a rate of change of error responsive means. Similarly, the Poitras '990 follow-up position control system includes all of the elements of claim 8 except for the rate responsive means broadly recited in element (1) of the claim and more particularly described by elements identified as (m) through (q).

Specifically, it should be recalled from the previous description of the Poitras '990 patent that it discloses a basic hydraulic follow-up position control system wherein an error and error modifying input are applied to a stroking piston from a stroke control valve for control of the tilt box of a hydraulic transmission, the output shaft of which drives an object into correspondence with a pilot device. Mathematically, the error modifying input generated in the Poitras '990 system represents the integral of the error minus stroking piston position feedback. It is this error modifying input which provides stability to the follow-up system and prevents hunting by the driven object.

With respect to claim 7, defendant's 35 U.S.C. § 103 argument turns on whether it would have been obvious to one of ordinary

skill in the position control art at the time of the Kane invention to provide stability in the Poitras '990 system by employing means responsive to the first time derivative of error for modifying the basic error input alternatively to the means responsive to the first time integral of the error and piston position feedback which are specifically shown in the Poitras '990 system. Similarly, with respect to claim 8, the inquiry is whether the *specific* rate responsive means claimed would have been an obvious alternative to the integrating and feedback means used in the Poitras '990 patent. The resolution of these questions necessarily involves a determination of the general level of skill in the art at the time of the Kane invention.

The publications by Hazen and Minorsky illustrate that the concept of utilizing the rate of change of system error to provide a modifying component for a basic system error signal in a position control system for the purpose of stabilizing system operation was well known prior to the Kane invention. Indeed, the patents to Davis and Agins both show that it was within the level of ordinary skill in the art prior to the Kane invention to embody this concept in a practical and operative follow-up position control system. Both patents disclose hardware for generating a rate of change of positional disagreement input to modify the basic positional disagreement input and enable a stable follow-up position control operation.

Given this general level of skill in the art, the conclusion is inescapable that the invention defined by claim 7 of the Kane patent would have been obvious to one of ordinary skill in the position control art at the time it was made. It is specifically concluded, in view of the prior art in existence at the time of the Kane invention, that it would have been obvious to persons skilled in the art to substitute the hardware for modifying the basic positional disagreement signal disclosed in patents such as Davis and Agins for the error modifying means taught by the Poitras '990 patent to thus obtain the same combination of elements as defined by claim 7.

In this manner the error modifying means specifically shown by the '990 patent, *i. e.,* means responsive to the first time integral of the positional disagreement and stroking piston position feedback, will have been replaced by the hardware disclosed by Davis and Agins for generating a rate of change of positional disagreement. Such a substitution renders the system defined by claim 7 obvious and the claim invalid.

The propriety of this conclusion is clearly brought into focus when one additionally considers that a signal representing system error plus the rate of change of system error is the equivalent of a signal representing system error plus the first time integral of system error minus stroking piston position, a fact established at trial and agreed to by expert witnesses for both plaintiff and defendant. Whether or not the mathematics was actually known at the time of the '138 Kane invention, the truth is that the devices were in fact equivalent, *i. e.,* operating in substantially the same way, performing substantially the same function, and producing substantially the same result. Thus, upholding the validity of claim 7 would afford an undeserved patent status to a system which embodied a well-known element, a rate of change of error means, for an equivalent well-known element, integral of error and piston position means, in an otherwise conventional position control system.

The same result cannot, however, be reached with respect to the invention defined by claim 8 of the Kane patent, which does not broadly call for a rate of change of error means to provide stability but rather recites specific structural elements as comprising the rate of change of error means. The specific rate of change of error means recited in claim 8 is not found in any of the prior art. Nor is there any suggestion from the prior art of record that would compel the conclusion that such a specifically enumerated means would have been obvious to one of ordinary skill in the art at the time of the Kane invention. Since the validity of claim 8 is not chal-

lenged on any other grounds,[7a] it is concluded that claim 8 of the Kane patent is valid.[8]

### The 5-inch 38 Caliber Single Mark 30 Gun Mounts

The accused device with respect to claim 8 of the Kane patent is the 5-inch 38 caliber single Mark 30 gun mount (hereinafter referred to as the "5″/38 single Mk 30" gun mount). Plaintiff contends that these gun mounts, originally manufactured during the 1930's and 1940's for use by the Naval fleet, were overhauled during the 1962 to 1971 timeframe by the Navy under the Ordnance Replacement Program at the Naval Ordnance Station in Louisville, Kentucky (hereinafter "NOS Louisville") and that such activity constituted unauthorized reconstruction for which plaintiff should be compensated.

In order to evaluate plaintiff's contention, it is necessary to consider and find that defendant not only has reconstructed, as distinguished from repaired originally purchased and/or licensed follow-up positioning systems, but that the reconstructed systems read literally and substantively on claim 8 of the Kane patent. Attention is initially directed to the latter of these threshold issues.

For reasons which will become clear *infra,* it is concluded that the 5″/38 single Mk 30 gun mounts read both literally and substantively on claim 8 of the Kane patent.

Two separate mechanisms of the 5″/38 single Mk 30 gun mounts are in issue. One is the gun mount with an Mk 39 train indicator-regulator. The other is the gun mount with an Mk 35 elevation indicator-regulator. Since the Mk 39 train and Mk 35 elevation indicator-regulators are structurally identical insofar as the issues before the court are concerned, the following discussion, although limited to the 5″/38 single Mk 30 gun mount in conjunction with the Mk 39 train indicator-regulator, is applicable to both systems.[9]

The 5″/38 single Mk 30 gun mount has an Mk 6 power drive which includes a hydraulic transmission comprising A-end variable displacement pump and a B-end hydraulic motor. The output shaft of the motor is connected through suitable gearing to the gun mount. A tilt plate controls the pump displacement as a function of its position. The position of the tilt plate is controlled by a stroking piston and cylinder.

In the instances where an Mk 39 train indicator-regulator is used with a 5″/38 single Mk 30 gun mount, a fine control synchro provides an output which is representative of the positional disagreement or error between the pilot device or director and the gun mount. An output is provided, in automatic control, in response to a command signal relayed from the director through a computer and also in response to a mechanical response signal from the output shaft of the hydraulic transmission.

The error signal is amplified in a hydraulic amplifier which includes a synchro valve

---

7a. Defendant contends that it also raised the invalidity defense of old combination which it characterizes as the mere aggregation of a number of old parts or elements which, in their aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them (citing *Lincoln Eng'r Co. v. Stewart-Warner Corp.,* 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008 (1938)), even though one of the combined parts may have been improved in and of itself. The answer to this defense, if raised, is that, as shown in the findings, the combination in claim 8 was not such an old combination but a new combination. Claim 7 represents an obvious new combination while claim 8 is a non-obvious new combination. [footnote by the court]

8. Defendant has challenged the validity of claim 7 under 35 U.S.C. § 102 on the basis of the Davis patent, as well as on other combinations of the prior art references described *supra* under 35 U.S.C. § 103. These other contentions need not be addressed in view of the invalidity of claim 7 on grounds already discussed. It should be noted, however, that none of the prior art patents show each and every element of claim 7.

9. It should be noted that plaintiff only alleges that 5″/38 single Mk 30 gun mounts having either an Mk 39 train or Mk 35 elevation indicator-regulator infringe claim 8 of the Kane patent. Gun mounts not having either of the above-identified indicator-regulators are therefore not accused or considered.

and piston. By means of a rigid but pivotal interconnecting lever, the amplified error signal is applied to a stroke control valve which supplies hydraulic fluid to one side or the other of the stroking piston.

Connected to the interconnecting lever between the hydraulic amplifier and stroke control valve is a stabilizing valve and piston combination which modifies the error signal applied to the stroke control valve as a function of the rate of change of positional disagreement between the director and gun mount. Hence, the stroke control valve operates the stroking piston and accordingly the hydraulic transmission as a function of the positional error plus the rate of change of positional error all through a time constant.

When the 5″/38 single Mk 30 gun mount is under local control, the hydraulic amplifier does not affect the operation of the gun mount. Rather, the position of the pilot device, which is a handwheel drive assembly in local operation as opposed to the director and computer, is transmitted through suitable gearing for comparison with the B-end output shaft position. System error thus appears as a differential output which is supplied through a local power clutch and crank arm directly to the interconnecting lever leading to the stroke control valve. Otherwise, local and automatic control are essentially identical and the rate of change of positional error is generated as described above.

As described fully in the appended findings of fact, the 5″/38 single Mk 30 gun mount having an Mk 39 train indicator-regulator reads both literally and substantively on claim 8 of the Kane patent. In fact, the accused device is almost a mirror image of the system shown in Fig. 4 of the Kane patent, which is reproduced in the findings of fact.

Defendant maintains that the accused device does not read on claim 8 of the Kane patent since it does not have "means responsive to positional disagreement of said pilot device and driven object" as required by element (k) of claim 8, but rather has means responsive to positional disagreement of the pilot device *and the output shaft of the hydraulic transmission.* Apparently, defendant is under the impression that claim 8 requires connection of the synchro directly to the driven object, *i. e.*, the gun mount.

However, the claim language itself does not require such a narrow reading. Moreover, a review of the specification to see what structure the patentee was referring to in the means clause of element (k) dispels any notion that direct connection to the driven object is intended. Rather, the specification clearly demonstrates that the synchro is connected to the output shaft of the hydraulic transmission and that the output shaft position, compared with the position of the pilot device, yields an output representative of the positional disagreement between the pilot device and driven object.

The Kane specification clearly sets this forth at col. 10, lines 15 to 21:

> Since [the] stator [of the synchro] * * is mechanically coupled to the output shaft * * * of [the hydraulic] transmission * * *, rotation or displacement of the rotor * * * from its zero position is therefore *the difference in positions of the pilot device and output shaft and hence it is the error between gun * * * and telescope * * *.* (emphasis added)

Such a process of interpreting the claim of a patent in light of its specification is a rudimentary and familiar process to this court. *See Autogiro Co. of America v. United States,* 384 F.2d at 397–98, 181 Ct.Cl. at 63; *Tate Eng'r, Inc. v. United States,* 477 F.2d 1336, 1340, 201 Ct.Cl. 711, 719 (1973).

In sum, the 5″/38 single Mk 30 gun mount having either an Mk 39 train or Mk 35 elevation indicator-regulator reads both literally and substantively on claim 8 of the Kane patent. The accused device performs the same functions in the same manner to achieve the same results as the claimed invention. *Autogiro Co. of America v. United States,* 384 F.2d at 399–400, 181 Ct.Cl. at 66–67.

### The Kane Limit Stop Invention *

To this point this decision has been concerned with structure that was necessary to insure that a gun would be able to accurately and quickly move into positional agreement with a pilot device. However, it is an equally important concern in follow-up gun positioning systems that the gun be prevented, while automatically following the position of the pilot device, from reaching a position where it is able to fire upon the ship itself or members of the crew. A simple but unsatisfactory solution to the problem is to merely provide mechanical stops on both sides of the gun mount to restrict its angular movement within permissible limits.

The Kane patent goes beyond this rudimentary solution and additionally discloses a limit stop mechanism for hydraulically stopping gun movement just prior to its arrival at a mechanical limit stop in order to prevent undesirable wear and damage to the gun or its associated structure. A concise description of the limit stop mechanism, and in fact the only discussion of the limit stop mechanism, appears at col. 15, lines 14 to 46 of the patent. In view of the highly pertinent nature of this disclosure to the issues before the court, the description is reproduced below in toto. As well, that portion of Fig. 4 of the Kane patent illustrating the limit stop mechanism is also reproduced:

"Usually a gun such as the gun 100 is mounted in such a place that it cannot rotate continuously, and accordingly, rigid mechanical stops are provided. It is necessary, therefore, to incorporate a control device that will prevent the hydraulic transmission from driving the gun into the mechanical stops under power. This device comprises the shaft 143 geared to the gun, crank arm 149, levers 150 and 151, lost motion mechanism 152, centering springs 153, and valve 154. The operation of this feature is as follows:

"As the gun 100 approaches a stop, the point E of lever 150 is moved vertically, and the lever 151 pivoting about the point H takes the lost motion out of mechanism 152 and raises the valve stem of valve 154. At this point in the operation, the piston 108 is in the dotted line position above its central or zero position. The valve 154 now blocks the flow of oil through pipe 111 to the piston 108 from valves 112 and 135, and admits oil to the space above the piston 108 from the pressure tank through pipe 162 and the port 156 of the valve 154, which forces the piston 108 downward towards its central or zero position so that the speed of the transmission is reduced as the gun approaches the mechanical stop, and just before the mechanical stop is reached, the speed is reduced to zero. If the action of the control is such as to cause the gun to rotate away from the mechanical stop, no restriction is imposed by the valve 154, as the flow of oil from the control valves 112 or 135 may pass to the piston 108 through the check valves 157 and 158."

From Stroke Control Valves 112 and 135
[See following illustration]

---

* Plaintiff does not seek review of the trial judge's adverse holding on claim 17 of the Kane '138 patent.

Fig. 4 of the Kane Patent

*Limit Stop Operation*

The disclosed limit stop mechanism includes a control valve 154 connected to the fluid supply lines 110 and 111, between the stroke control valve 112 and the stroking piston 108.

Control valve 154 includes a spool having upper and lower double land sections and a centering spring 153 so that in normal (non-limit) operation control fluid is channeled from the stroke control valve 112 to the stroking piston through the center grooves of the land sections of valve 154.

As the gun rotates and begins to approach a mechanical stop, point E of lever 151 is raised vertically through the action of lever 150, crank arm 149 and shaft 148. The latter is connected through appropriate gearing to the gun and initiates movement of point E when the gun is approaching limiting position.

As point E continues its vertical ascendency, lever 151 pivots about point H (connected to the control valve 154 through a valve rod and the centering spring 153) until the pronged lever 151 contacts the lost motion mechanism 152. When this occurs further vertical motion of point E raises point H which, in turn, moves valve 154 in an upward direction.

As valve 154 is raised, it blocks the flow of oil that normally flows between the stroke control valve and the stroking piston by way of hydraulic line 111.

Port 156, which connects valve 154 to the upper chamber of piston 108 and, as well, the corresponding unmarked port connecting valve 154 to the lower chamber of piston 108 are larger than the input ports of valve 154 to which hydraulic lines 110 and 111 are connected. Thus, simultaneous with the blockage of flow to piston 108 from the line 111 due to the upward movement of valve 154, high pressure fluid is admitted through pipe 162 and port 156 to the upper chamber of piston 108. Similarly, the pressure in the lower chamber of piston 108 is simultaneously diminished as move-

ment of valve 154 causes a lower chamber to communicate with drain through the unmarked enlarged lower part of valve 154. Piston 108 is urged down towards its neutral position as a result of this differential pressure across it. The specification states that the piston 108 is brought to rest at its neutral position but does not describe how this is accomplished. Nonetheless, since movement of gun 100 is controlled by the stroking piston 108, gun 100 will only come to rest prior to reaching a mechanical stop if stroking piston 108 comes to a complete stop.

According to the Kane specification, check valves 157 and 158 and their associated by-pass lines do not comprise part of the limit stop mechanism which brings the gun to rest prior to contact with a mechanical limit stop. On the other hand, the check valves and by-pass lines are necessary to allow the gun to be brought away from the mechanical limit stop by allowing high pressure fluid which would otherwise be blocked by valve 154 to reach the stroking piston.

Claim 17 defines a position follow-up control system incorporating a limit stop mechanism for bringing the driven object to rest prior to reaching a limit position. The claim reads as follows, broken down into lettered sections by element for ease of analysis:

17. A follow-up system for controlling (b) an object to move into positional agreement with (a) a pilot device comprising in combination

(c) an hydraulic transmission device for driving said object, (d) a device for controlling the speed and direction of rotation of said transmission,

(e) a cylinder having a (f) piston movable therein for actuating said control device,

(g) connections from said cylinder to a source of fluid pressure,

(h) a valve in said connections,

(i) means responsive to positional disagreement of said pilot device and driven object for actuating said valve to control said transmission device to drive said object toward correspondence with said pilot device,

(j) a second valve in said connections between said first valve and said piston, and

(k) means operable in limiting positions of said object for controlling said second valve to interrupt the supply of fluid from said first valve to said piston and for supplying fluid to said piston to actuate said control device to stop the driving action of said transmission device.

Elements (a) through (i) of claim 17 read on the basic position control system as fully set forth hereinabove in connection with the discussion of claims 7 and 8.

The second valve identified as element (j) in claim 17 reads on the control valve 154.

The "means operable in limiting positions," element (k), reads on lost motion mechanism 152, lever 151, arm 150, crank arm 149 and shaft 148. As will be shown *infra,* check valves 157, 158 and their associated bypass lines are not elements of claim 17.

Defendant asserts the invalidity of claim 17 under 35 U.S.C. §§ 102(e), 102(g), and 103. Additionally, but in a rather oblique fashion, 35 U.S.C. § 112 is asserted as a defense. Finally, defendant asserts that none of the accused devices infringe claim 17. Since, for reasons which will be explained in considerable detail hereinbelow, it is concluded that claim 17 is invalid on the basis of Section 112, the remaining defenses need not and will not be addressed.

The manner of operation of the Kane hydraulic limit stop mechanism has been a continual source of dispute between the parties. As the following analysis will reveal, the Kane patent fails to disclose an operative limit stop mechanism.

Although defendant has gone to great lengths to assert that the Kane patent discloses a mechanically, rather than a hydraulically, operated limit stop mechanism for bringing the stroking piston to neutral and hence the gun to rest, it is beyond peradventure that the Kane patent discloses a hydraulically operated limit stop mecha-

nism. The Kane specification, see col. 15, lines 31 to 41, supra p. 773, clearly provides that upon the blocking of oil from line 111 by valve 154, high pressure fluid from source 162 is admitted to the upper chamber of the stroking piston 108, and it is the high pressure fluid, "which forces the piston 108 downward towards its central or zero position so that the speed of the transmission is reduced as the gun approaches the mechanical stop, and just before the mechanical stop is reached, the speed is reduced to zero." (emphasis added)

This clearly enunciates a hydraulic coercion of the stroking piston.

Defendant next argues, even assuming that the limit stop operates hydraulically, that the check valves 157 and 158 prevent the gun from coming to rest before its arrival at a mechanical limit stop. Specifically, plaintiff contends that if check valves 157 and 158 allow unrestricted [10] forward flow, no pressure differential can be created across the stroking piston 108 to return it to neutral. Defendant points out that even if control valve 154 blocked high pressure flow from line 111 to the stroking piston, check valve 158 would provide a bypass path to allow that high pressure flow to reach the lower chamber of the stroking piston and neutralize the high pressure provided to the upper chamber of the stroking piston by pressure source 162 through port 156. The result, defendant maintains, would be that the stroking piston would remain in a position where it continued to drive the hydraulic transmission and hence the gun towards the mechanical limit stop.

The simple answer to defendant's argument is evident after a careful reading of the previously-quoted portion of the Kane patent which relates to the limit stop operation. The Kane patent clearly shows that the check valves play no role in bringing the gun to rest just prior to reaching the mechanical stop. The specification, to the contrary, attributes such results to the ac-

tion of the second valve 154 and the associated limiting means to control it.

Since the Kane specification does not require that check valves 157 and 158 be included as part of means clause (k) of claim 17, they are not necessary to perform the functions recited in the claim and thus will not be read into that clause. Technitrol, Inc. v. Control Data Corp., 394 F.Supp. 511, 185 USPQ 801 (D.Md.1975).

A comparison of claim 18 with claim 17 confirms the conclusion that check valves and their bypass lines are not to be read into the "means operable in limiting positions" recited as clause (k) of claim 17. As stated earlier in this opinion, such a claim comparison is useful in determining the scope and coverage to be afforded to claims in issue. Bethell v. Koch, 427 F.2d at 1374; Stukenborg v. Teledyne, Inc., 299 F.Supp. at 1156.

Claims 17 and 18 are couched in identical language except that claim 18 additionally calls for, "check valves in said connections providing for actuation of said piston by said positional disagreement responsive means to cause said transmission device to drive said object away from said limiting position."

Thus, claim 17 recites a follow-up position control system including a second valve and means operable in limiting positions for controlling that valve to bring the driven object to rest. Claim 18 recites a follow-up position control system including not only the two aforementioned elements but, additionally, check valves for bringing the driven object out of the limiting position.

Summarily, the clear language of claim 17, the fact that check valves are not necessary to perform the position limiting functions recited in claim 17, and a comparison of claims 17 and 18 lead to the inevitable conclusion that check valves are not to be read into claim 17 as part of the clause (k) "means operable in limiting positions."

10. The parties are in disagreement as to whether a "check valve" by definition connotes unrestricted forward flow or both restricted and unrestricted flow. As can be seen from this opinion, this point becomes irrelevant since claim 17 does not require any check valves.

With this interpretation as background, it is clear that a pressure differential will indeed be created across the stroking piston under limit stop operation which will hydraulically coerce the stroking piston towards its neutral position.

Notwithstanding the above analysis, which was only relevant to establish the meaning of the language used in claim 17, it must be concluded that claim 17 is invalid since it recites, and the specification describes, an inoperative system.

The trial transcript clearly demonstrates that if the control valve 154 *completely* blocks fluid flow from line 111 during the *entire* limit stop operation, there is nothing to stop the stroking piston when it reaches its neutral position. Consequently, the stroking piston 108 will pass its neutral position and reverse the hydraulic transmission, thus driving the gun away from the limit stop.

As this occurs, point E on lever 151 would be lowered, thus simultaneously lowering control valve 154 and bringing the gun back under normal control of the stroke control valve. The stroke control valve and the associated structure will then operate, assuming that the pilot device has not been moved, to reverse the direction of movement of the gun again and drive it towards the mechanical limit stop.

These actions would thus be repeated and the gun would continually oscillate in and out of limiting position. Summarily, the gun would never be brought to rest as contended by both the disclosure and clause (k) of claim 17, *supra* p. 775, which requires:

> means operable in limiting positions of said object for controlling said second valve to interrupt the supply of fluid from said first valve to said piston and for supplying fluid to said piston *to actuate said control device to stop the driving action of said transmission device.* (emphasis added)

Defendant contends that the control valve 154 is disclosed as completely blocking the oil flow from hydraulic line 111 during the entire limit stop operation and thus the disclosed system is inoperative.

Conversely, plaintiff asserts that defendant's view is an unfair and restrictive interpretation of the Kane specification and claims. Rather, plaintiff contends that the Kane specification does not disclose complete blockage by control valve 154 during the entire limit stop operation and that one of ordinary skill in the art at the time of the Kane invention would have read the Kane specification and would have been able to design control valve 154 such that the stroking piston was brought to rest at neutral position. Such a design would have entailed providing a pressure differential as previously described through the initial blockage provided by control valve 154 to move the stroking piston towards neutral. Then, as neutral position was approached, the position of control valve 154 would be varied such that pressure from line 111 was allowed to reach the lower chamber of stroking piston 108 in order to balance and offset the pressure in the upper chamber of stroking piston 108 which is provided from pressure source 162. The action of valve 154 would thus be designed to achieve complete balancing of pressure across stroking piston 108 by the time neutral position was reached, and gun 100 would therefore come to rest.

Having carefully reviewed the Kane specification, the claims and file wrapper and the trial record, it is concluded that the disclosed invention requires a complete blockage of fluid from line 111 during the entire limit stop operation. In addition to the above-described mode of operation being required by the Kane specification, claim 17, as well, calls for a complete blockage of fluid from line 111 during the entire limit stop operation. Accordingly, claim 17 fails to recite an operative combination.

Turning first to the Kane patent, lines 32 and 33 of col. 15 explicitly state that as the control valve 154 is raised it "blocks the flow of oil through pipe 111 to the piston 108." This is the only recitation in the entire Kane specification addressed specifically to the interaction between control

valve 154 and the flow of oil from the main hydraulic lines 110 and 111 during limit operation. The plain import of this statement is that no oil passes from line 111 through control valve 154 to the stroking piston during limit operation.

Another statement found in the Kane specification supports this conclusion. At col. 15, lines 43 to 46, the specification recites that when it is desired to move the gun away from limiting position "*no restriction is imposed by the [control] valve 154, as the flow of oil from the * * * [stroke control valve 112] may pass to the [stroking] piston 108 through the check valves 157 and 158.*" (emphasis added) The clear implication of this last statement is that no oil would pass to the stroking piston when it was desired to move the gun out of limiting position but for the presence of the check valves and their associated bypass lines, thus confirming the conclusion that when the specification used the term "blocks" in describing the interaction of the control valve 154 and hydraulic line 111, it meant a complete blockage of oil flow from hydraulic line 111 by control valve 154.

Looking also to the patent file wrapper, further support for the conclusion that a complete blockage of fluid from line 111 was required during limit stop operation is found in the patentee's own statements made during the prosecution of the Kane patent in the United States Patent and Trademark Office.

During the patent prosecution, the patentee described the limit stop operation as follows:

The description of the operation beginning at line 29, on page 19 [which appears at lines 14 to 45 of col. 15 of the patent] has been reversed *in order to make the operation clearer.* In this connection the drawing has been amended to show the position of the piston 108 in dotted lines above its central or zero position. The specification has been amended to point out that the oil is supplied through the pipe 111 at this point in the operation and that the vertical movement of the valve stem of valve 154 *cuts off the flow of oil*

*from the pipe 111* and admits oil under pressure through the pipe 160 [renumbered 162] and the port 156 to the space above the piston 108 so as to cause the piston to move towards its zero position. (emphasis added)

The clear import of plaintiff's own representations to the Patent Office as to how the system was to operate during limit stop, *i. e.,* "cuts off the flow of oil from the pipe 111" unquestionably requires that no oil passes from line 111 to the stroking piston during limit operation once control valve 154 has been raised.

In short, plaintiff has produced no evidence to support its position that control valve 154 does not completely block oil flow from hydraulic line 111 during the entire limit stop operation. To the contrary, the Kane specification and file wrapper demonstrate clearly that the patentee disclosed a hydraulic limit stop mechanism utilizing a control valve which completely blocks oil flow from the main hydraulic lines during limit operation. Certainly it is beyond question that the patent does not disclose nor describe a mechanism to bring the gun to rest under such conditions.

 Claim 17, in embodying the above-described limit stop mechanism, thus fails to recite an operative system since the disclosed and claimed structure is incapable of performing its recited function of stopping the hydraulic transmission and bringing the gun to rest. On this basis, claim 17 cannot stand and is therefore held to be invalid under 35 U.S.C. § 112. *Blohm & Voss AG v. Prudential-Grace Lines, Inc.,* 346 F.Supp. at 1130.

PART II

On the issue of reconstruction versus repair, the court's opinion (borrowing its hard facts from the trial judge but differing in legal analysis, ultimate conclusions, and result) is as follows:

*The NOS Louisville Ordnance Replacement Program*

 Having concluded in Part I, *supra,* that claim 8 of the Kane '138 patent reads

on the accused devices, it becomes necessary to determine if defendant's operations at NOS Louisville amounted to an impermissible reconstruction or a lawful repair.[11] To understand the full ramifications of the repair versus reconstruction issue, a certain amount of background facts setting forth the Navy's fleet maintenance program is essential.

A. Prior to 1962, the Navy serviced its fleet on three levels. On-board maintenance, known as organizational level maintenance, was performed by sailors. Ship tenders performed what was referred to as intermediate level maintenance. Finally, major maintenance activities were performed at Naval shipyards. This last activity was known as depot level maintenance. While an exact differentiation between the three levels of maintenance is not felt to be necessary, it should be stressed that depot level maintenance was only considered as a last resort and by definition was concerned with jobs which could not be performed at the other two levels.

During the early 1960's the Navy decided to concentrate all depot level maintenance at a single facility. Louisville, Kentucky, where the Navy had purchased an old Westinghouse plant in 1946, was chosen; and, in 1962, a program known as the Ordnance Replacement Program was established at the Naval Ordnance Station, Louisville.

NAVORD Instruction 8300.1, dated November 20, 1967, summarizes the goals of the Ordnance Replacement Program. This directive officially established the Ordnance Replacement Program in 1967. The instruction indicated that:

> The Ordnance Replacement Program was established for the purpose of replacing 15–25 year old ordnance installations on active ships with new or completely rebuilt ordnance from stock. The replacement guns, rocket launchers, and fire control equipments are cycled through NAVORDSTA Louisville or participating activities for complete Ordalting or rebuilding to like new condition prior to issue.

The 5″/38 single Mk 30 gun mount was one of the first equipments to be processed at NOS Louisville. Since 1962 all 5″/38 single Mk 30 gun mounts have been overhauled, if at all, at NOS Louisville under the Ordnance Replacement Program. The trial record establishes that all of the gun mounts were originally manufactured during the 1930's and 1940's, and in any event not later than 1945. Thus, the gun mounts coming into NOS Louisville during the 1960's were on the average 25 to 30 years old. Those gun mounts sent to NOS Louisville were characterized by inordinate amounts of down time while on-board ship and it was the goal of the Ordnance Replacement Program to bring their operation back up to new performance specifications. This meant that an overhauled gun mount would perform according to original manufacturer's performance specifications but with a shorter life span.

The overhaul procedures for the 5″/38 single Mk 30 gun mounts which will now be described typify those used during the 1967 to 1971 timeframe at NOS Louisville. The testimony at trial was insufficient to justify

---

11. Claim 8 of the '138 patent defines a patented combination of 17 basic unpatented elements. These elements are found in the accused 5″/38 single Mk 30 gun mount as four basic components, i. e. the handwheel drive assembly (element b); the gun, slide, carriage and stand (element a), the Mk 6 power drive (elements c through i) and the indicator-regulators (each including elements j through q).

It is not contended that there is any liability for use of the devices as originally procured before overhauling. (The '138 patent issued in 1954 and expired in 1971; the six-year statute of limitations, 28 U.S.C. § 2501 (1970); 35 U.S.C. § 286 (1970), first ran no later than 1960, the plaintiff taking no action with respect to alleged infringement until 1963). Moreover, under *Calhoun v. United States*, 453 F.2d 1385, 1391–92, 197 Ct.Cl. 41, 51–53 (1972), the manufacture and use of the original item must be considered as licensed and the Government entitled to repair the item without paying further compensation. Conversely, the Government would be liable under *Calhoun* if it reconstructed the patented invention rather than merely repairing the device.

firm conclusions as to the precise nature of the program prior to 1967.[12]

When a 5″/38 single Mk 30 gun mount was removed from a vessel, it became part of a continuous stream of equipment flowing in and out of NOS Louisville under the Ordnance Replacement Program. There was little concern for returning a gun mount to the ship from which it was removed. In fact, during the 1966 to 1968 timeframe, virtually all attempts to return a mount to its original vessel were abandoned. Rather, the first available gun mount of similar kind coming out of NOS Louisville was sent to the ship as a replacement, thus minimizing the down time of the ship. This was made increasingly possible since certain vessels were being retired from the fleet and extra 5″/38 single Mk 30 gun mounts were added to the replacement pool.

In removing a gun mount from a ship, it was necessary to sever all cables from the pilot device (director and computer). All air lines were disconnected and the bolts securing the gun mount to the ship removed.

Removal of the gun mount from a ship was performed at a Naval shipyard. After removal, the shipyard replaced all wiring from the director and computer to the gun mount with plug-in cables. The director and computer remained on-board ship. The gun mount was then forwarded to NOS Louisville.

For every five gun mounts that were forwarded to NOS Louisville, approximately three would be in condition to be overhauled. The other two would be scrapped with the components, wherever possible, going to a spare parts pool.

The overhaul operation for all 5″/38 single Mk 30 gun mounts processed at NOS Louisville followed a standard procedure. The condition of a gun mount was first determined by reducing it into its four major components, i. e., train and elevation indicator-regulators, power drive, gun and

pilot device. *See* Note 11 *supra*. These major components then went to separate work areas where they were reduced to their smallest readily separable part. All parts would be cleaned and inspected. Parts which were worn, scored, broken or corroded beyond reasonable use would be replaced. The major components were then reassembled. However, in carrying out these operations, no attempt was made to see that the original major components were reassembled together. The gun mount was then tested to see if it met performance specifications. During the overhaul process, all seals, bearings and wiring would be replaced.

NOS Louisville had its own Annex Supply which housed some parts. A Ships Part Control Center (hereinafter "SPCC") in Mechanicsburg, Pennsylvania, stored spare parts. Among those parts at SPCC Mechanicsburg were some Mk 39 train and Mk 35 elevation indicator-regulators which had never been used or installed on ships previously, notwithstanding that they were some 25–30 years old. Finally, the Naval Ammunition Depot (hereinafter "NAD") in Crane, Indiana, held a pool of scrapped gun mounts from which parts could be cannibalized for use as needed.

As stated *supra*, after major components such as the power drive and indicator-regulator were removed from a gun mount in the central work area, they were forwarded to individual work areas.

The indicator-regulators were completely disassembled in an indicator-regulator area. Standard procedure called for disassembly, cleaning and inspection of all parts, including the individual valves and pistons. Scored valve sleeves or parts having excessive tolerances were replaced. Synchro motors were forwarded to an electrical area for disassembly and overhaul of the electrical sections. The indicator-regulators were completely rewired to replace old wiring with new, fungus-coated wiring to prevent deterioration.

---

12. *I. e.*, the evidence was insufficient to justify conclusions as to the precise nature of the overhaul program during the years 1962 to 1967. The Kane patent expired in 1971.

Finally, the indicator-regulators were reassembled and tested. The reassembled indicator-regulator would then be returned to the main work area for installation on whichever gun mount was being overhauled at that time. On the average, at least 1 month would pass from the time work began on an indicator-regulator to the time it was sent back to the main work area for use on the next available gun mount. In sum, there was no concern for mating an overhauled indicator-regulator with the original gun mount from which it had been removed.

The power drive was overhauled in essentially the same manner as the indicator-regulator and, similarly, used on whichever gun mount was on the work stand when it became available.

There was no attempt to return any major components to the gun mounts from which they were originally removed. Further, the reassembled gun mount was shipped to and installed on the ship currently in need.

ORDALT's were also incorporated into the gun mount. ORDALT is an acronym for Ordnance Alteration and is a change or alteration to a piece of equipment that is in use. For example, NAVORD ORDALT No. 3887, dated October 1, 1960, provided instructions for replacing obsolete synchro motors with new performance synchros. The result of such ORDALT's. in certain cases was to upgrade the performance of parts of the gun mount beyond the original performance specifications set at the time the gun mount was first manufactured.

The average total overhaul time for a 5″/38 single Mk 30 gun mount was 7 months at an average cost of $100,000.

Overhaul of 5″/38 single Mk 30 gun mounts under the Ordnance Replacement Program went far beyond the depot level maintenance previously performed at Naval shipyards. Shipyard maintenance generally did not involve complete disassembly and mix-match of subassemblies as occurred at NOS Louisville. A shipyard would normally only repair those parts that were not functional at the time the ship came into the shipyard. Further, the gun mount was reinstalled on the same vessel from which it was removed.

B. With respect to the NOS Louisville Ordnance Replacement Program—the only overhaul program said to infringe—it is important, in our view, to bear in mind the following significant facts (which the trial judge did not deem of great importance):

(1). Of the 17 elements of the patented combination, see note 11, supra, G.E. appears to have itself supplied the defendant, prior to 1945, with at least fifteen elements of the original gun mounts sent to Louisville for overhauling—all except the gun (and accoutrements) and possibly the handwheel drive assembly.[13]

(2). G.E. had also sold to defendant, prior to 1945, a large number of new indicator-regulators which were stockpiled and used as spare parts in overhauling the accused gun mounts. Likewise, it appears that a substantial number of power drives, sold by G.E. to the Navy, were stockpiled for possible use as spares.

(3). Approximately 60% of the gun mounts forwarded to NOS Louisville were in condition to be overhauled, while about 40% were scrapped with the components, wherever possible, going to a spare parts pool. When a gun mount was overhauled, needed replacement parts were taken, to a very large extent, from this spare parts pool, as well as from the pool of unused

---

**13.** The preponderance of the evidence is that all the indicator-regulators (8 elements) and at least 1400 power drive units (7 elements) were supplied by plaintiff. There is a dispute as to whether some of the power drive units (incorporated in the original mounts) came, not from G.E., but from a Navy manufacturing installation. The trial judge made no finding on this precise point, and our review of the record shows that, at best, plaintiff has failed to prove that any of the power drive units in the original gun mounts came to the Navy through a source other than G.E.

It is clear that the guns themselves (and accompaniments)—one element—did not come from G.E. but it is unclear whether G.E. supplied the handwheel drive assembly (one element of the patented combination).

indicator-regulators (referred to immediately above).

(4). Many gun mounts sent to Louisville had to have very little work done on them beyond the basic disassembly, cleaning, inspection, replacement of bearings, seals and wiring, reassembly and testing.

(5). There is no sufficient proof that, during the overhauling process, any *new* elements, acquired from others than G.E. or manufactured by the Government, were introduced.

(6). The average cost of refurbishing a gun mount at Louisville was about $100,-000. The original cost of manufacturing the gun mount was about $800,000, and the worth to the Navy in terms of the original cost of manufacture plus spare parts in store was about $1,000,000.[14]

From these facts (together with others stated above and in the findings) we draw the conclusion that plaintiff has failed to prove that, in overhauling the accused gun mounts, the Navy used (aside from the guns) and substantial number of components—new or old—obtained from other suppliers than G.E., or manufactured by the Government itself; on the contrary, the fair inference is that Louisville used either old, refurbished components from the parts of the original gun mounts supplied by G.E., or new indicator-regulators and power drives originally purchased from G.E. and kept in the spare parts pool.[15] It follows that, of the components of the overhauled gun mounts, only the guns (and accompaniments) and possibly the handwheel drive assembly did not come at all from the plaintiff; and even those two elements came from the original gun mounts. As we shall see, these ultimate facts are cardinal to our limited decision in this case.

C. The leading modern case on reconstruction versus repair is *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961),

commonly referred to as "Aro I." There, the Supreme Court considered a patent containing claims drawn to a combination for use with an automobile body comprising a flexible top fabric, supporting structures and a mechanism for sealing the fabric against the side of the automobile body to keep out rain.

In reversing the lower court's decision that replacement of the unpatented flexible top fabric in the patented combination amounted to infringing reconstruction, the Court stated, at 344–45, 81 S.Ct. at 604, that: "[If] anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant. * * * The basic fallacy in respondent's position is that it requires the ascribing to one element of the patented combination the status of patented invention in itself."

The Court then summarily disposed of the "heart of the invention" theory of reconstruction reflected in many lower court cases by stating, at 345, 81 S.Ct. at 604, that, "No element, not itself separately patented, that constitutes one of the elements of a combination patent is entitled to patent monopoly, however essential it may be to the patented combination, and no matter how costly or difficult replacement may be."

and applied the above principle to the reconstruction-repair dichotomy in the following language at 346, 81 S.Ct. at 604:

The decisions of this Court require the conclusion that reconstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to "in fact make a new article," * * * after the entity, viewed as a whole, has become spent. * * * Mere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the

---

14. Also, the life span of the renovated gun mounts was considerably shorter than of the original mount.

15. In his opinion, the trial judge described the overhauled gun mounts as consisting of "spare, cannibalized and overhauled components which happened to be available * * *."

lawful right of the owner to repair his property. Measured by this test, the replacement of the fabric involved in this case must be characterized as permissible "repair," not "reconstruction."

Defendant argues strongly that *Aro I* permits a finding of reconstruction (rather than repair) only where *all* elements of the patented combination, including so-called "minimal" elements, are replaced, no single element of the original combination being retained. The trial judge, on the other hand, was apparently willing to find reconstruction (in the circumstances here) even though many or all of the original elements happened to be used again in recreating (as he deemed it) the combination, and such spare parts as were used came from G.E. He thought that there was no specific talisman but that the question of reconstruction *vel non* had to be decided in each instance on the particular facts. In this instance he considered, first, that the original gun mounts had fulfilled their useful lives and were therefore "spent," and, second, that the method of operation at Louisville demonstrated that the Navy was creating a "new article" when it overhauled the original gun mounts—primarily because the original mounts were "spent" and the Navy disassembled the mounts into components and put them back together without taking account of the particular mounts or ships from which the individual components had come.[16]

To dispose of this case we need not tackle the correctness of the Government's strict reading of *Aro I*, nor need we decide if the trial judge's approach would be correct if a substantial number of new components, *not from G.E.*, were introduced by NOS Louisville into the overhauled gun mounts. For this case it is enough, in our view, that, as we have pointed out, the overhauled gun mounts appear to have been refurbished from the components in the original mounts, plus some new indicator-regulators or power drives purchased from the plaintiff itself—and that of the 17 elements (all unpatented) in the patented combination embodied in the original mounts, at least 15 (and possibly 16) came to the Navy from G.E. itself. Thus, except for the gun (and accoutrements), plaintiff must be taken as the source of almost all of the elements making up both the original and the overhauled combination.[17]

16. In his opinion, the trial judge said:

"[T]he gun mounts which were sent to NOS Louisville were no longer suitable for their intended uses. Due to their inordinate amounts of down time, these 25 to 30-year old gun mounts were no longer reliable and in more than a token sense contributed additional danger to the vessel and its crew in terms of readiness for and actual use in combat conditions. . . . In sum, these gun mounts had fulfilled their useful lives and were 'spent' as that term has been used by the courts throughout the last 100 years.

When a gun mount was disassembled into its four basic components . . ., the patented combination ceased to exist. All that remained of the original gun mount was the base ring. Moreover, the separated components were never reunited. . . . [A] new gun mount was being constructed around the base ring from components then available for use. Once the components taken from a gun mount had been overhauled, they then became available for installation on whichever gun mount was being constructed at the time.

"In sum, each gun mount coming out of NOS Louisville was constructed not from its original components, but rather from spare, cannibalized and overhauled components which happened to be available at the time of construction. Moreover, an overhauled gun mount would then be sent to whichever vessel needed it at the time, with no attempt being made to return a gun mount to its original vessel." (footnote omitted)

Later in his opinion the trial judge summarized as follows the significant factors he took into account:

"These factors include the inability of the 5″/38 single Mk 30 gun mounts to perform basic, necessary functions which they were originally meant to perform, the inability of traditional maintenance procedures to bring the gun mounts up to these performance levels, the age of the original gun mounts, the complete disassembly at NOS Louisville and the failure to maintain gun mount integrity between components, the substitution of the next available components from stock or overhaul for all original components removed from the gun mount regardless of whether or not the removed components were individually spent and the failure to return the gun mount to its original vessel." *Id.*

17. Plaintiff, of course, has the burden of proof on issues relating to infringement (including "reconstruction"). *See Strumskis v. United*

784

■ In these circumstances it seems to us that the user of the combination (the Navy) was not creating a "new article" in the sense of *Aro I*, even though the gun mounts were disassembled in order to be overhauled, and even though, in some or most or all instances, the reassembled elements were not returned to the same gun mount or the same ship. This follows, we think, from the principle grounding compensation for a licensee's using a patented combination composed of unpatented elements. *See Calhoun v. United States,* 453 F.2d at 1391–92, 197 Ct.Cl. at 52–53.[18] When it obtains its license, such a licensee is deemed to have paid full compensation for the privilege of using the combination itself and is not required to pay again merely for using the whole of the combination, even including some replacement from another source of a worn-out unpatented element. *Id.*

In this case there are two separate (but interlocking) grounds on which the Navy should be held to have already fulfilled its obligation to compensate G.E. for using the combination—as if the United States had specifically paid General Electric for a license. The first is the running of the statute of limitations which frees the United States from all liability at least up to 1963 or 1964, *see* note 11, *supra,* and makes the Government the equivalent of a paid-up licensee for the period barred by limitations.[19] *Cf. United States, v. 422,978 Square Ft. of Land, San Francisco,* 445 F.2d 1180, 1187–89 (9th Cir. 1971). This covers the whole combination (including the two elements which plaintiff may not have supplied).

■ The second and more important ground for saying that the United States has already paid to use the combination—a ground filling any open gaps in the statute of limitations—is that, in the overhaul process, no new components were purchased by the Government from others than G.E. or were made by the Navy itself; almost all the components came from G.E. itself, either through the procurement of the original mounts or in the use for replacement of new spare parts which had also come from G.E. In paying plaintiff for those components, the defendant impliedly obtained a license to use the combination and compensated G.E. therefor.[20] In addition, it is highly improbable that G.E. could have sold to the defendant 15 out of 17 elements in the combination without implicitly authorizing the latter to use the combination so long as the General Electric-supplied elements were able to be used and were in fact used; and this is true of both the sale by G.E. of the original components of the gun mounts and of the new unused components which were kept as spare parts and incorporated in the overhaul process. *See Stukenborg v. United States,* 372 F.2d 498, 504, 178 Ct.Cl. 738, 748 (1967). Unless there is some definite provision in the sale to the contrary, *see Cotton-Tie Co. v. Simmons,* 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79 (1882), *as explained in Aro I,* 365 U.S. at 343, n. 9, 81 S.Ct. 599, it can properly be assumed that as part of the bargain the seller of a device incorporating a patented combination (composed, as here, of unpatented elements) authorizes the buyer to continue to use the device so long as the latter can and does use

*States,* 474 F.2d 623, 628, 200 Ct.Cl. 668, 676–77, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *Stamicarbon v. Escambia Chemical Corp.,* 430 F.2d 920, 931, 166 USPQ 362, 371 (5th Cir.), *cert. denied,* 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970).

**18.** *Calhoun,* as we have indicated, holds that the Government must be treated as the equivalent of such a licensee. *See* note 11, *supra.*

**19.** The trial judge found that the period of recovery for reconstruction was limited to 1967–1971 (when the patent expired) because the evidence was insufficient to justify conclusions as to the precise nature of the overhaul program during the years 1962–1967. *See* note 12, *supra.* Plaintiff challenges this holding, but we find it unnecessary to pass on it or to decide the exact period barred by limitations.

**20.** "* * * it is fundamental that sale of a patented article by the patentee or under his authority carries with it an 'implied license to use.'" *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 484, 84 S.Ct. 1526, 1531, 12 L.Ed.2d 457 (1964) (*Aro II*).

the elements he purchased from the patentee or licensor.[21]

In this respect the case is very close to *Wilbur-Ellis Co. v. Kuther,* 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964). Kuther was the owner of a combination patent covering a fish-canning machine; the combination, like the one here, was of unpatented components. He sold four of these machines (at a price including his royalty) to someone else who later resold them to Wilbur-Ellis, as a second-hand purchaser. At that time, three of the machines had been unused for some years, "exposed to rain and salt air, corroded and frozen solid to the extent that they were inoperable when acquired by Wilbur Ellis"; they were "apparently regarded as 'junk' " *Kuther v. Leuschner,* 200 F.Supp. 841, 844 (N.D.Cal.1961), *aff'd,* 314 F.2d 71 (9th Cir. 1963), *rev'd sub nom. Wilbur-Ellis Co. v. Kuther,* 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964). Originally the machines were constructed to pack fish into one-pound cans. Wilbur-Ellis had the machines reconditioned to operable condition and also had six of the 35 elements of the patented combination resized so that the machines could pack 5-ounce cans. The Supreme Court held that this reconditioning was more like repair than reconstruction. Stressing that the patentee, in selling the machines, had already received compensation for the use of the combination, *see* 377 U.S. at 423, 425, 84 S.Ct. 1561, Mr. Justice Douglas's opinion for the Court saw no "reconstruction" because,

although Wilbur-Ellis "in adapting the old machines to a related use were doing more than repair in the customary sense * * * what they [Wilbur-Ellis] did was kin to repair for it bore on the useful capacity of the old combination * * *." *Id.* at 425, 84 S.Ct. at 1563. It made no difference that the machines were inoperable when Wilbur-Ellis acquired them or that "the adaptation made in the six nonpatented elements improved the usefulness of these machines." *Id.* at 423, 424, 425, 84 S.Ct. at 1563.[22]

The old gun mounts in the present case were no more completely "spent", as a whole, than the fish-canning machines in *Wilbur-Ellis*; the 60% which the Navy chose to renovate (and did not cannibalize) must be considered to have "had years of usefulness remaining though they needed cleaning and repair." *Id.* at 424, 84 S.Ct. at 1563. Indeed, this case is, in one sense, a *fortiori* from *Wilbur-Ellis* in that there was no effort to adapt the mounts to different uses. Of special relevance, therefore, is the statement in *Wilbur-Ellis, see* note 22, *supra,* that if those machines had been renovated and put to use with their original adaptability (one-pound cans), "there could be no question but that they were 'repaired,' not 'reconstructed,' within the meaning of the cases." [23]

■ The trial judge thought the same result not mandated here primarily because of "the complete disassembly at NOS Louis-

---

**21.** The principle is not changed because the gun itself (and accompaniments)—one of the 17 elements of the combination—did not come from G.E. Plaintiff, which obviously would not furnish the gun, could not and would not object to transferring one of the patented gun mounts, as a whole, from one gun to another, or to the Navy's replacing only the gun. In any event the decisions are plain that replacement of one or two elements of a many-elemented combination does not constitute reconstruction by a licensed user. *See Aro I,* 365 U.S. at 345–46, 81 S.Ct. 599; *Stukenborg v. United States,* 372 F.2d at 504–05, 178 Ct.Cl. at 747, 749; *Wells Mfg. Corp. v. Littelfuse, Inc.,* 547 F.2d 346, 351, 357, 192 USPQ 256, 260, 265–66 (7th Cir. 1976). Similarly for the handwheel drive assembly (also one element) if plaintiff is taken as not having supplied that element.

**22.** The Court said, "These four machines were not spent; they had years of usefulness remaining though they needed cleaning and repair. Had they been renovated and put to use in the '1-pound' cans, there could be no question but that they were 'repaired', not 'reconstructed,' within the meaning of the cases." 377 U.S. at 424, 84 S.Ct. at 1563.

**23.** In *Wilbur-Ellis*, it is worth noting, to renovate the machines in order to retain one-pound capacity would have required complete replacement of six elements which were too rusted or corroded to use again for that purpose. *See Leuschner v. Kuther,* 314 F.2d 71, 72–73 (9th Cir. 1963) (the Court of Appeals decision reversed by the Supreme Court).

ville and the failure to maintain gun mount integrity between components, the substitution of the next available components from stock or overhaul for all original components removed from the gun mount regardless of whether or not the removed components were individually spent and the failure to return the gun mount to its original vessel," *See* note 16, *supra.* We do not think that these factors call for a different conclusion than in *Wilbur-Ellis.* The assembly-line method adopted at Louisville was simply a speedier, less expensive, more efficient, and more effective means of refurbishing the gun mounts than if they had been disassembled and renovated gun mount by individual gun mount, and then returned to the same ship—and the end-result was precisely the same. Disassembly and renovation by individual gun mount would surely not be enough to show reconstruction—or *Wilbur-Ellis* could not have been decided as it was—but it would have been a much more burdensome, time-consuming, and costly procedure. Achieving precisely the same result by a more practical, economical and convenient process is surely not required by the patent law in order to avoid imposition of further liability. The substance of what was done to the mounts would be the same by either method, the difference being simply that the procedure followed by the Navy at Louisville was easier, quicker and less expensive. *Cf. Electric Auto-Lite Co. v. P & D Mfg. Co.,* 109 F.2d 566, 567, 44 USPQ 377, 379 (2d Cir. 1940).[24] If it is permissible, as it is, to introduce wholly new components, acquired from another supplier, into the renovation of a device embodying a patented combination, *see* notes 21 and 23, *supra,* it is very hard to say that the assembly-line method followed at Louisville amounted to reconstruction when the record indicates that in the overhauling process the Navy worked with, substantially, all G.E.-supplied elements and did not introduce new elements acquired from others than plaintiff.

24. It should be recalled that "many gun mounts had to have very little work done on them beyond the basic disassembly, cleaning, inspec-

For these reasons we hold that the defendant had a right to overhaul the gun mounts without paying any further compensation to the plaintiff. There was no infringement through the NOS Louisville overhaul program even though claim 8 of the Kane patent has been upheld as valid in Part I, *supra.* Since there was no infringement, plaintiff can recover nothing in this suit and the petition must be dismissed.

## CONCLUSION OF LAW

Upon the findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is dismissed.

tion, replacement of bearings, seals and wiring, reassembly and testing" (finding 282).